Argued May 5, 1972, reversed and remanded April 26, 1973

MARKLE, *Appellant, v.*
MULHOLLAND'S, INC., ET AL, *Respondents.*
509 P2d 529

*Franklyn N. Brown,* Tigard, argued the cause for appellant. With him on the brief was James F. Mc-Caffrey, Tigard.

*Joe D. Bailey,* Hillsboro, argued the cause for respondents. With him on the brief was Carrell F. Bradley, Hillsboro.

HOLMAN, J.

Plaintiff. was injured when the left rear tire of his automobile blew out, causing the vehicle to leave the highway. The tire had been purchased by plaintiff for $12.35 nine months earlier, after it had been recapped. It had 5,000 to 6,000 miles of use at the time of the accident. Defendants are the recapper, the wholesaler, and the retailer of the recapped tire. At the completion of the testimony, the trial court granted defendants' motion for a directed verdict. Judgment was entered thereon, and plaintiff appealed.

Plaintiff's cause of action was pleaded in two counts: the first, in negligence; the second, in strict liability.

■ Plaintiff assigns as error failure to admit testimony by a rubber chemist that he inspected the tire after the accident and found the rubber of the side walls to be so subject to ozone deterioration that the casing was not suitable for recapping. However, plaintiff's counsel admitted, during his offer of proof, that "* * * we don't have testimony to say that because of this [ozone deterioration] the tire was dangerous." It therefore was not error to reject the testimony because the condition concerning which the chemist testified was irrelevant to any defect in the tire which may have caused the accident.

Plaintiff's only other assignment of error was the granting of defendants' motion for a directed verdict. He contends there was sufficient evidence to take the case to the jury on both counts.

The only other expert witness presented by plaintiff testified that the failure of the tire was due to an air pocket in the casing which either was in

existence in the casing at the time of original manufacture or was formed when a small pin hole developed in the inner layer of the casing, allowing air to seep into the cord. He did not say which was the more probable, nor could he say, in the latter event, whether the hole had already developed by the time the casing was retreaded and sold to plaintiff. The expert also testified that, in his opinion, the blowout was not due to impact. No one testified that the blowout was caused by the manner in which the retread had adhered to the casing. Plaintiff testified that from the time it had been purchased by him the recapped tire had been driven almost exclusively on paved roads, had been properly inflated, and had not been driven into curbs, large rocks or chuck holes, or otherwise abused.

■ Three specifications of negligence were pleaded:

1) Failing to properly test and inspect the tire by putting it in an ozone chamber;

2) Recapping a casing which showed ozone markings;

3) Failing to inspect after recapping to determine the degree of adherence of the cap to the casing.

The testimony of plaintiff's witnesses did not substantiate in any way any of the allegations of negligence in the complaint. As a result, plaintiff failed to sustain his negligence count.

Plaintiff contends that, even in the absence of being able to show negligence or the exact reason for the air pocket in the casing, the tire did not perform in accordance with a purchaser's reasonable expectations. He claims that evidence of such nonperformance, of the resultant dangerousness, and of the lack

of probable causes for its nonperformance for which he would have been responsible is sufficient to take the case to the jury on his strict liability cause of action.

■ The initial problem with this cause of action is the nature of plaintiff's strict liability claim. The complaint on which the action was tried purports to state a cause of action for breach of warranty. In previous cases, because of the evolving nature of the law in this field, we have treated similar complaints as stating as broad and all-encompassing a cause of action as it was possible to state for strict liability arising out of the sale of goods. In those cases we did not limit the issue to the warranty type of strict liability under the Uniform Commercial Code (UCC). *See McGrath v. White Motor Corp.*, 258 Or 583, 484 P2d 838 (1971), and *Vanek v. Kirby*, 253 Or 494, 450 P2d 778, 454 P2d 647 (1969).

In *McGrath* we called to the attention of the bar the difficulty engendered by the use of "warranty" if it was the intention of the pleader to state as broad a case as possible in strict liability. The original opinion in *McGrath* was handed down April 29, 1971. It was, of course, not published in the Advance Sheets until a short time later. All the pleadings upon which the instant case was tried were made up by May 5, 1971. Plaintiff, apparently, heeded the admonition in *McGrath* and tendered before trial an amended complaint, but it was not accepted by the court for reasons not appearing in the record, and it was not filed.

At trial and upon appeal this case was treated as an ordinary strict liability case, and the Oregon cases discussed by both sides in their briefs were

decided under Section 402A[1] of Restatement (Second) of Torts. No claims of lack of notice, of disclaimer, or of any other restriction upon liability particular to the provisions of the UCC were made. Under such circumstances we believe that plaintiff should not be prevented from putting what he apparently considers to be his best foot forward. We hold for the purposes of this case that plaintiff's allegations that the tire was not of merchantable quality and therefore blew out are the equivalent of an allegation that it was defective.

In *Wights v. Staff Jennings,* 241 Or 301, 405 P2d 624 (1965), we rationalized the seller's liability as being one of tort arising out of a breach of implied warranty of merchantable quality. We rejected as the *sole* basis[2] for products liability the rationale of enterprise liability because its natural and logical extension would require the enterprise to be re-

---

[1] "§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

[2] "Although we reject the theory of enterprise liability *standing alone* as a basis for recovery in the so called products liability cases * * *." (Emphasis added.) 241 Or at 310.

sponsible for the "inevitable accident toll" which results from all its activities, not just from its sale of goods. *Wights* was a case involving an ultrahazardous article; therefore, the application of Section 402A was unnecessary to establish liability. However, we subsequently adopted it in *Heaton v. Ford Motor Co.,* 248 Or. 467, 470-71, 435 P2d 806 (1967), and determined that liability under that section, as we conceive it, is "* * * conceptually related to the traditional warranty of merchantable quality in the law of sales." When, in *Heaton,* we adopted Section 402A, we said nothing about enterprise liability, which is one of the rationales given in comment *c* under Section 402A for the formation of the rule.

Thereafter, we decided a series of cases under Section 402A without any further comment as to whether we were rejecting or accepting the enterprise liability rationale. This has been commented upon in *Products Liability in Oregon: Present and Future,* 8 Will L J 410, 424 (1972):

> "* * * [T]he entire products liability case law is confused by the court's express rejection of the enterprise liability approach to products liability in *Wights,* and its later adoption in *Heaton* of *Restatement (Second) of Torts,* § 402A which is actually based on the enterprise liability theory * * *." (Footnote omitted.)

We necessarily adopted a limited theory of enterprise liability when we adopted Section 402A. Why else would liability under the section be restricted to those who are engaged *in the business* of selling? It was restricted to them because they are in a position to spread the risk while others are not. The comment to the section so recognizes. However, that restricted form of enterprise liability should not be confused

with the absolute liability we disavowed in *Wights*. We were correct in *Heaton* in rationalizing the seller's strict liability as being conceptually related to implied warranty of merchantable quality and in pointing out in *Wights* that if there were no more to the rationale of such liability than distribution of the risk occasioned by the enterprise, its logical extension would carry us to absurd lengths.

In addition to the enterprise liability rationale, something similar to the rationale behind an implied representation of merchantable quality also has to be part of the theoretical basis for the rule. There is no other way to account for the language used in the discussion of the meaning of "defective condition" in comment g[8] to Section 402A, such as, "in a condition not contemplated by the ultimate consumer." The same can be said of language used in the discussion of "unreasonably dangerous" under comment i,[9] such as, "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." This language is consistent only with something conceptually similar to an expectation by the consumer of merchantable quality. It is an expectation which is the result of the manufacturer's or seller's placing the article in the stream of commerce with the intention that it be purchased. This expectation is

---

[8] "The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him * * *." Restatement (Second) of Torts § 402A, at 351.

[9] "* * * The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics * * *." Restatement (Second) of Torts § 402A, at 352.

given legal sanction by the law through an assumption that the seller, by so placing the article in the stream of commerce, has represented that the article is not unreasonably dangerous if put to its intended use. This is so even though the comment to Section 402A admonishes us that liability under the section is not in warranty because it is not subject to certain contract rules.[6] In addition, the history of Section 402A shows the gradual evolution from the law of warranty.

The relation to warranty has been generally recognized. The following language from Dickerson, *Products Liability: How Good Does a Product have to be?*, 42 Ind L J 301, 304-05 (1967), is appropriate:

"Despite these differing approaches, the underlying problem appears to be the same. Apparently, it makes no material difference whether a court operates under the common law, the Uniform Sales Act, or the Uniform Commercial Code, and whether it takes the traditional warranty approach or the *Restatement* approach. Thus, a coherent, uniform idea of 'legal defectiveness' that fits comfortably with each of these approaches, as well as with the principles of negligence, can be developed.

"Consideration of the reported cases strongly suggests that the factors defining compliance with minimum standards of consumer use (and, conversely, the non-compliance inherent in the idea of legal defect) are closely identified with the normal, reasonable expectation patterns of buyers and sellers. This is not surprising, because the protec-

---

[6] "* * * There is nothing in this Section which would prevent any court from treating the rule stated as a matter of 'warranty' to the user or consumer. But if this is done, it should be recognized and understood that the 'warranty' is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales." Restatement (Second) of Torts § 402A, comment *m* at 355 (1965).

tion of, or reluctance to disturb, established patterns of expectation motivates much of the law
* * * "

Both rationales, that of a representational tort and that of enterprise liability, have their place in Section 402A. The enterprise liability rationale is one of expansion of the protection of consumers; the representational aspect is one of limitation in an attempt to keep that expansion within manageable and logical bounds and to keep the liability from being absolute.

■ The relationship between the risk spreading and representational aspects is discussed in P. Keeton, *Products Liability—Liability Without Fault and the Requirement of a Defect*, 41 Tex L Rev 855, 858-59 (1963). Professor Keeton states as follows:

"* * * [C]ourts that impose strict liability eliminating negligence as a requirement for recovery must adopt some rules or principles as a substitute for negligence as a delimiting principle. The method employed to date is the requirement that there must have been a defect in the product as it left the hands of the manufacturer. This requirement remains the principal obstacle to a recovery. What should be the scope of the manufacturer's duty or warranty? What should be the test of a defect? The answer to the question of the scope of the warranty or the test or definition of a defect depends to a certain extent upon the reasons or policies for the imposition of liability in the first place. If the basis for responsibility is primarily reliance on the manufacturer to put out products in accordance with his express or tacit representations as to their nature, and in accordance with the latest scientific knowledge and discoveries, and by the exercise of reasonably developed skill, then perhaps a product should not be regarded as de-

fective if it is no different from that which a consumer expected it to be. If, on the other hand, the underlying basis for the imposition of strict liability is the notion that the manufacturer is a better risk bearer because of his capacity to shift losses incurred from the use of the products to the consuming public generally, then the issue is somewhat different, and the problem is one of allocating between the particular user and the manufacturer losses resulting from the various risks or hazards that inhere in the use of a product."

As previously indicated, we have decided that our basis for limiting the enterprise responsibility rationale is the requirement that there be a defect in the article. The test of a defect is whether the article is in conformance with a tacit representation which the law imposes that it is not unreasonably dangerous if put to the use for which it was manufactured. This rationale is consistent with Section 402A and with the previous opinions of this court in this field.

Justice Schaefer of the Supreme Court of Illinois has summed it thusly in *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill 2d 339, 247 NE 2d 401 (1969):

"Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function * * *." 247 NE2d at 403.

The concurring opinion of McAllister, J., holds that a representation of merchantable quality is not a doctrinal basis for liability under Section 402A. This opinion holds that there is something analogous to such a representation behind the Section, because it

cannot be determined what constitutes a defect as contemplated by the Section without first determining whether the purchaser had a right to expect that the article was free from the condition which caused the injury. If he did have such a right, the condition constitutes a defect under the Section. One can only determine what a purchaser had a right to expect by the implications express or inherent in the sale to him. These implications are analogous to those underlying a representation of merchantable quality.

■ Defendants' motion for an order of involuntary nonsuit as to plaintiff's strict liability cause of action was stated in the following manner:

"* * * upon the further ground that there is neither proof nor pleading that there was a defect in the tire at the time the tire left the hands of the defendant.

"There is no substantial evidence that the tire was not reasonably suitable and fit for use as a tire on an automobile at the time it left the defendants' possession."

The trial court was of the opinion there was insufficient evidence of a defect at the time of the sale. If the air pocket between the plies concerning which plaintiff's expert testified was in existence at the time of original manufacture the tire was necessarily defective at the time it was retreaded and sold to plaintiff. However, he testified that it was equally probable that the air pocket was created subsequent to original manufacture by a leak from a small hole on the inside of the casing but he could not say whether this occurred before or after the tire was retreaded. Thus, we must assume the situation which is the more favorable to defendants: that the small hole and resultant air pocket, which the witness said caused the blowout,

came into existence subsequent to the retreading of the tire and its sale to plaintiff.

In the absence of abuse or of abnormal use by plaintiff since the purchase, which abuse plaintiff denied, it could be inferred that the casing was weakened or worn at the time of sale, for otherwise the defect would not have manifested itself before the expiration of the casing's anticipated use. The requirement that the defect must have existed when the product left the remanufacturer's control does not mean that the defect must manifest itself at once. The defect may be latent. The fact that there was no evidence that the remanufacturer by the exercise of reasonable care could have detected the weakness in the casing would be relevant if this were a negligence case. However, it is irrelevant in a strict liability action. The case should have been submitted to the jury.

It can be argued that plaintiff could not reasonably expect performance the equivalent to that which he would have received from a new tire because he paid only $12.35 for a tire which probably would have cost $25 to $30 had it been new. Also, he was aware that the casing had already been used for the life for which it originally had been manufactured. Nevertheless, the manufacturer selected this casing from among all available casings to retread and this implies something concerning its condition. Tread was put upon it which was capable of lasting more than 5,000 or 6,000 miles. This indicates that there is reason to believe that the manufacturer intended and the purchaser had a right to expect a quality of performance from the casing greater than that which it gave. In addition, everyone knows that, absent an impact with some object, a blowout while engaged in ordinary highway

travel is not a normal or usual thing. As the condition of tires has improved, such a blowout has become a rare and unexpected thing.

The immediate seller and the wholesaler come within the purview of Section 402A by the terms of (2)(b) and comment *f*[®] thereunder.

■ The concurring opinion of the Chief Justice has raised the question of whether the UCC is the exclusive source of liability in non-negligence cases and, thus, whether this court was free to adopt Section 402A. As that opinion concedes, impediments to recovery, such as notice, privity, disclaimer, and limitation of remedy, make little sense in the usual context of personal injury cases. A statutory scheme made essentially for business transactions among merchants is not geared to, nor appropriate for, the determination of those liabilities to the public at large for which manufacturers and merchants must respond.

In the final analysis, it is the intention of the legislature that governs. The lack of legislative history on this particular point indicates that, in all probability, the legislature never considered the matter (which is true of most statutory construction problems or else they would not exist). In the absence of legislative consideration of the matter, we must speculate on what the legislature would have done had it anticipated the existing problem. It is our belief that the legislature would not have intended to pre-empt the field and thus to prevent the development of case law

---

[®] "* * * The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant * * *." Restatement (Second) of Torts § 402A, at 350 (1965).

for the additional protection of consumers, particularly by way of a statutory scheme primarily oriented to an entirely different field of law.

Where the results would be regrettable, as is conceded by the concurring opinion, courts usually do not construe statutes in a manner that would bring about such results in the absence of fairly specific language. We find no such specific language in the UCC or in its comments indicating pre-emption.

All states but Louisiana have adopted the UCC. The courts of many states have adopted Section 402A. Obviously, none of these courts thought the UCC pre-empted the field. The court of no state has so held. We conclude that we were free to adopt Section 402A.[7]

The judgment of the trial court is reversed and the case is remanded for a new trial.

O'CONNELL, C. J., specially concurring.

The majority opinion is written on the assumption that even though the remedy for injuries resulting from a defective product is available under the Uniform Commercial Code, the court is free to provide relief under a separate theory of strict liability as defined in § 402A of the Restatement (Second) of Torts (1965). We have made this assumption in previous cases. It is my opinion that we should no longer indulge in that assumption.

A careful reading of the Uniform Commercial

---

[7] In addition to the legal literature on the subject cited in the Chief Justice's opinion, see Donovan, *Recent Development in Products Liability Litigation in New England: The Emerging Confrontation Between the Expanding Law of Torts and the Uniform Commercial Code*, 19 Me L Rev 181 (1967). *Also see* Chapman v. Brown, 198 F Supp 78, 100 (D Hawaii 1961), for its analogous holding that the Uniform Sales Act did not pre-empt the field.

Code reveals that it prescribes a legal framework for the recovery of damages for personal injuries resulting from defective products. Recovery for personal injuries resulting from the negligent conduct of the seller is left for the courts to develop.[1] But it is apparent that aside from the negligence cases the Code provides an integrated and comprehensive scheme under which recovery for personal injuries may be sought both by privity and non-privity plaintiffs.

This subject matter is treated under the rubric "warranty," thus drawing to it the previously developed case law including the law of implied warranty of merchantability. Many courts, including our own, came to perceive that the basis for recovery for breach of an implied warranty of merchantability was in substance recovery for strict liability in tort.[2] This fact was emphasized by the authors of § 402A,[3] and was utilized by courts in developing a common law of strict products liability based upon tort principles and free from the strictures of Code provisions relating to disclaimers, limitation of remedy, privity and notice requirements. But development of this case law has

---

[1] See ORS 71.1020 (3), ORS 71.1030, and Comment 2 to ORS 72.3180, published in 1962 by the Legislative Counsel Committee.

[2] See, e.g., McGrath v. White Motor Corp., 258 Or 583, 484 P2d 838 (1971); Heaton v. Ford Motor Co., 248 Or 467, 470, 435 P2d 806 (1967); Wights v. Staff Jennings, 241 Or 301, 305, 405 P2d 624 (1965); Greeno v. Clark Equipment Company, 237 F Supp 427 (N D Ind 1965); Vandermark v. Ford Motor Co., 61 Cal2d 256, 37 Cal Rptr 896, 391 P2d 168 (1964); Greenman v. Yuba Power Products, Inc., 59 Cal2d 57, 27 Cal Rptr 697, 377 P2d 897 (1961); Goldberg v. Kollsman Instrument Corp., 12 NY2d 432, 240 NYS2d 592, 191 NE2d 81 (1963). See also, Prosser, The Assault Upon the Citadel, 69 Yale L J 1099, 1126-27 (1960) and Prosser, The Fall of the Citadel, 50 Minn L Rev 791, 800-02 (1966).

[3] Restatement (Second) of Torts 355-56, § 402A, comment *m* (1965).

posed the question of legislative pre-emption,[a] and that question is not resolved by the determination that breach of warranty is more tort than breach of contract. If pre-emption obtains, then of course the court is not free to adopt § 402A.

After careful study of the question I have reluctantly concluded that the Code is controlling in this area of the law. I say "reluctantly" not only because that conclusion would require us to repudiate cases predicated on § 402A, but also because the requirements of the Code relating to notice and disclaimer do not make much sense in the field of personal injury cases. But the fact that these requirements are ill-fitting does not give us license to purge them from the statute.

The Uniform Commercial Code, as enacted in Oregon, focuses on dealings between businessmen. But a fair reading of the Code and its official comments indicates its attention to the question of sales to consumers as a part of the general subject matter of commercial transactions. Moreover, personal injury problems are dealt with explicitly. In ORS 72.7150, injury to person or property resulting from breach of warranty is specified as an aspect of consequential damages sanctioned by the Code. Limitation of such

---

[a] See generally, Rapson, Products Liability Under Parallel Doctrines: Contrasts Between the Uniform Commercial Code and Strict Liability in Tort, 19 Rutgers L Rev 692 (1965); Titus, Restatement (Second) of Torts Section 402A and the Uniform Commercial Code, 22 Stan L Rev 713 (1970); Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective Products Cases, 18 Stan L Rev 974 (1966); Dickerson, The ABC's of Products Liability—With a Close Look at Section 402A and the Code, 36 Tenn L Rev 439 (1969); Shanker, Strict Tort Theory of Products Liability and the Uniform Commercial Code: A commentary on Jurisprudential Eclipses, Pigeonholes and Communication Barriers, 17 Wes Res L Rev 5 (1965).

damages in the case of consumer goods is declared prima facie unconscionable in ORS 72.7190 (3). It is evident that persons other than the buyer of products may recover damages for personal injuries under ORS 72.3180 and the comments to that section. And the comments to ORS 72.6070 include a discussion of the variability of notice requirements when applied to retail consumers and section 72.3180 beneficiaries.

Very probably the disposition of the cases which we have decided under § 402A would be no different under the Uniform Commercial Code. But while § 402A rejects disclaimer and notice impediments to recovery in all cases,[5] the Code envisions at least some circumstances in which recovery may be conditioned by satisfaction of those requirements. Nor can it be said that § 402A and the Code were intended to deal with different buyer-seller relationships; by its terms the former covers immediate as well as remote parties to a sale, and a careful reading of the official comment to ORS 72.3180 indicates that similar coverage is permitted by the Code. It is true that the general interpretation section of the Code permits the Code to be supplemented by case law development.[6] But I do not

---

[5] *Supra* n. 3.

[6] "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant * * * shall supplement its provisions." ORS 71.1030.

This is not to say that courts may not go beyond the Code's explicit coverage in certain circumstances.

"The official comments to the Uniform Commercial Code clearly contemplate case law development concerning both privity [ORS 72.3180, Comment 3] and the extension of warranties to non-sale transactions [ORS 72.3130, Comment 2]. However, the comments hopefully express an 'intention that the policies of this Act may offer useful guidance in dealing with

think that this can be regarded as giving the court the license to create a separate body of common law which covers substantially the same field and displaces the Code's explicit provisions.

As I have said, notice and disclaimer provisions of the Code do not make much sense in the context of personal injury cases. Strict products liability resting on tort principles and free of such requirements seem most responsive to contemporary notions of who should bear the burden of compensating members of the public for personal injuries resulting from defective products. But the legislature has spoken in unambiguous terms on this precise problem, and it is for the legislature to decide whether public policy as expressed in the Code is well or ill-conceived.

As first stated, I believe that the disposition of the instant case would be the same under § 402A and the Uniform Commercial Code. With regard to my conclusion that the Code is controlling in this area of the law, I would hold that the statute should govern all future products liability cases wherein discovery of an alleged breach of warranty occurs after the date of this decision.

The position taken by the majority injects into our law of products liability complexities which are likely to haunt us in future cases. An example of the confusion which is invited by our present holding is the suggestion in Justice McAllister's specially concurring opinion that there are two parallel causes of

---

further cases as they arise.' The matters of * * * notice, and disclaimer are specifically covered by the Code, and should be regarded as an expression of legislative policy." Rapson, *supra* n. 4 at 712-713.

action, one under the Code and one under § 402A, each of which must be pleaded differently. Apparently the magic word "warranty" in the complaint will signal a Code cause of action. I can see no reason for recognizing a cause of action as arising under the Code once this court has taken the step of designing its own theory of products liability outside of the Code. The practical effect of our holding is that § 402A is the exclusive test of liability. I read the majority opinion to mean that if a plaintiff elects to bring his action on the theory of § 402A, defendant could not set up a defense of disclaimer or lack of notice even though those defenses were given to sellers under the Code. Adopting the majority's position, so far as the defendants in the products cases are concerned, § 402A provides the exclusive body of law governing their liability. And practically speaking, § 402A can be regarded as the exclusive remedy of the plaintiffs in products cases simply because there would be no reason for a plaintiff to seek a remedy under the Code since it would always be to his disadvantage. The only explanation a plaintiff could give for filing a complaint under the Code would be inadvertence or mistake—it certainly cannot benefit him in any way. Thus it can be said that the Code has no utility and can be disregarded because plaintiffs do not need it and defendants cannot have it. If we permit a plaintiff to bring his action either under the Code or under § 402A, we put ourselves in the strange position of holding that plaintiff can elect to use the Code as the basis for his action, but defendant does not have the privilege of utilizing Code defenses if the plaintiff decides that he does not want them interposed.

To avoid the confusion invited by Justice Mc-ALLISTER's opinion, we should declare that our action

in recognizing § 402A as a separate principle upon which to rest the personal injury cases in the products field has the effect of excluding recovery under the Code.

I also disagree with Justice McALLISTER's conclusion that our previous adoption of § 402A of the Restatement (Second) of Torts constituted an adopttion of the so-called enterprise liability rationale found in the comment to § 402A which, of course, would constitute a repudiation of our pronouncement in *Wights v. Staff Jennings,* 241 Or 301, 405 P2d 624 (1965), rejecting enterprise liability as the sole basis for imposing strict liability in products cases.

The fallacy in Justice McALLISTER's reasoning is in confusing the rule laid down in § 402A with the commentator's explanation for the adoption of the rule. The rule is found in the blackletter statement which is to the effect that a commercial seller of goods who sells a product in a defective condition unreasonably dangerous to the user or consumer or his property is subject to liability for physical harm caused by the product. There is nothing to compel the conclusion that this rule is necessarily based upon the reasoning that the seller can best bear or shift the cost of injury, although this happens to be the explanation used in the comment. Proof that this is not the only explanation for strict liability is found in the comment to § 402A in its original form, which limited strict liability to sellers of food. In that comment the reporter explains:

"* * * In the beginning these decisions displayed considerable ingenuity in evolving more or less fictitious theories of liability to fit the case. The various devices included an agency of the intermediate dealer or another to purchase for the

consumer, or to sell for the seller; a theoretical assignment of the seller's warranty to the intermediate dealer; a third party beneficiary contract; and an implied representation that the food was fit for consumption because it was placed on the market. In later years the courts have become more or less agreed that the theory of a 'warranty' from the seller to the consumer, either 'running with the goods' by analogy to a covenant running with the land, or made directly to the consumer. Other decisions have indicated that the basis is merely one of strict liability in tort, which is not dependent upon either contract or negligence." Restatement (Second) of Torts, Tentative Draft No. 6, p. 34 (Apr. 7, 1961).

At the time § 402A was first drafted *Greenman v. Yuba Power Products, Inc.,* 59 Cal2d 57, 377 P2d 897, 27 Cal Rptr 697 (1963), which originated the enterprise liability theory to support recovery for personal injury in the products cases, was not yet decided and the cases relied upon as a basis for the rule stated in § 402A used one or more of the various theories listed in the comment quoted above.

It is demonstrable then that the rule expressed in § 402A need not be based upon the enterprise liability theory as the concurring opinion seems to assume.

This being so, it seems exceedingly strange to pick out for endorsement the one basis for liability which this court had previously rejected in *Wights v. Staff Jennings, supra.* In that case we held that the seller could be held strictly liable for selling a product which creates an ultrahazardous condition, but we refused to accept the view advanced in *Greenman v. Yuba Power Products, supra,* on the ground that if we adopted such a theory we would be forced to

extend strict liability. across the board to situations. not involving products.

In *Heaton v. Ford Motor Co.*, 248 Or 467, 435 P2d 806 (1967) we relied upon the rule stated in § 402A in holding that the seller could be held liable for personal injuries resulting from the use of an un-reasonably dangerous vehicle. It is apparent from that opinion that the court did not regard its holding as inconsistent with the position which it had previously taken in *Wights*. And it is to be noted that no mention was made of enterprise liability in *Heaton* as the basis for the decision. The reasoning in *Heaton* centered upon the question of whether the product failed to meet the reasonable expectations of the user. The court held that "If the product failed under conditions concerning which an average consumer of that product could have fairly definite expectations, then the jury would have a basis for making an informed judgment upon the existence of a defect." 248 Or at 472. This is essentially the same approach one finds in cases using a warranty theory to impose liability. And when the warranty approach is taken, the courts have not deemed it necessary to find support for imposition of liability in the loss shifting rationale of enterprise liability. *Heaton* followed the same pattern of reasoning.

The concurring opinion does not explain why the enterprise liability rationale would not be equally applicable to cases in which the plaintiff was injured by a "defect" not involving products. If we took the course suggested, it would be difficult to explain why strict liability should not be imposed upon non-negligent store owners for injuries caused by defective premises. And the same conclusion would have to be

reached with respect to any defendant who could shift the cost of injuries under the enterprise liability rationale.

The majority opinion correctly concludes that the product cases can rest upon a theory of liability which has application only where there is a sale of goods. Under that theory the seller is deemed to impliedly represent to all purchasers that the goods marketed by him meet a certain standard. That standard is determined by the reasonable expectation of purchasers. This is in essence the test employed in § 402A. That test does not have any necessary connection with the theory of enterprise liability, although it is not likely that this court, or any other court, would impose liability upon a seller unless he theoretically, at least, could spread the loss through the pricing of his product.

McALLISTER, J., specially concurring.

This is a products liability case to recover for injuries sustained by plaintiff when a recapped tire on the left rear wheel of his car blew out, causing the car to leave the road and crash into a pole. Plaintiff sued the recapper, the wholesaler, and Mulholland's, Inc., from whom he bought the tire. The trial court directed a verdict for all defendants and plaintiff appeals.

The amended complaint on which the action was tried alleged that defendants negligently recapped the tire and, further, that defendants had breached their implied warranties of merchantable quality. Despite those allegations, plaintiff, in his brief, relies on cases applying the rule of strict liability in tort as embodied in § 402 A of the Restatement of Torts 2d. Defendants, in their brief, also rely entirely on cases decided

in § 402 A. Neither party makes any reference to the statutes governing implied warranties.

In *McGrath v. White Motor Corp.*, 258 Or 583, 593-594, 484 P2d 838 (1971) we said:

"\* \* \* The complaint in this case was drafted at a time when the concept the pleader was attempting to allege was emerging as a tort of strict liability. Admittedly, he used the term of 'implied warranty,' a term often associated with contract. The concept of strict liability in products liability cases is now sufficiently recognized that we suggest the problems caused by the use of 'warranty' can be avoided by the use of tort terms. \* \* \*"

In that case we reaffirmed our adoption of § 402 A in *Heaton v. Ford Motor Co.*, 248 Or 467, 435 P2d 806 (1967).

As *McGrath* was decided only days before the amended complaint was filed in this case, I agree with the majority that, under the circumstances, it is proper to apply the rules of strict liability in tort. I would emphasize, however, that the bar of this state has now been given ample warning that the use of warranty terminology is not a proper way to raise the issue of strict liability under § 402 A. In cases commenced after the publication of the *McGrath* opinion, we should assume that a plaintiff who couches his complaint in warranty terms has done so because he wishes to proceed under the provisions of our commercial code dealing with warranties in sales contracts. Similarly, a complaint phrased in § 402 A language should be construed as an attempt to state a cause of action for strict liability in tort. Plaintiff's attorneys should, in each case, carefully distinguish between the two theories and clearly frame their pleadings accordingly.

I concur in the majority's holding that it was not error to exclude the testimony of plaintiff's rubber expert Lucas on the subject of ozone deterioration in the rubber of the casing. Although this witness, during the offer of proof, testified that he found substantial ozone deterioration when he examined the tire, and that this deterioration would reduce the strength and elasticity of the rubber, he was unable to say that the ozone deterioration had progressed to the point that the tire was unfit for recapping. Plaintiff's effort to prove his cause of action in negligence failed when his witness was unable to testify that any excessive ozone deterioration was the cause of the blowout.

I also agree with the majority that the case should have been submitted to the jury on the strict liability count. However, because I am unable to agree with the effort of the majority to rest § 402 A liability on two separate inconsistent bases I am filing this separate opinion. The majority concept of a dual theory of § 402 A liability permeates the opinion, but is epitomized by the following statements:

"In addition to the enterprise liability rationale, something similar to the rationale behind an implied representation of merchantable quality also has to be part of the theoretical basis for the rule. * * *

* * * * *

"Both rationales, that of a representational tort and that of enterprise liability, have their place in Section 402A. * * *"

As formulated in § 402 A, the necessary elements of a strict products liability case are (1) the sale of a product by one who is engaged in the business of selling such products; (2) a product which was

expected to, and did, reach the consumer or user without substantial change in condition; (3) a product which, when sold, was in a "defective condition unreasonably dangerous to the user or consumer"; (4) injury to the user or consumer, or damage to his property; (5) which was caused by the product's defective condition. In order to prove the third and fifth elements —the product's defective condition and causation—the plaintiff generally begins by showing that an unexpected malfunction of the product during normal use resulted in injury. In some cases, the seller's prima facie liability will be evident from the facts of the accident itself. If the product is new, if it is being used for the precise purpose for which it was intended, and if the accident is clearly caused by a failure of the product itself, plaintiff's proof on these elements will often be relatively simple.

In other cases, however, it will not be so easy to show that the product was defective. If, for example, the product fails because of a weakness which developed through use, or while being subjected to unusual stress, it will be necessary for the plaintiff to show somehow that the failure was the result of some shortcoming in the product for which the seller should be held liable. Proof of a specific flaw may be available in such cases. See *Tucker v. Unit Crane & Shovel Corp.*, 256 Or 318, 473 P2d 862 (1970); *McGrath v. White Motor Corp.*, supra. There will be cases, however, where the product cannot be examined for such flaws, or where, because of the condition or nature of the product, examination will not disclose with certainty whether a specific identifiable flaw, which was present at the time of sale, was the cause of the product's failure. In such cases, the definitions in the

Comments to § 402 A become important. Comment *g* provides:

> "The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition *not contemplated by the ultimate consumer,* which will be unreasonably dangerous to him. * * *" (Emphasis added.)

In Comment *i* we find:

> "* * * The article sold must be dangerous to an extent *beyond that which would be contemplated by the ordinary consumer* who purchases it, with the ordinary knowledge common to the community as to its characteristics. * * *" (Emphasis added.)

In other words, the plaintiff will often have to prove that the ordinary consumer would reasonably expect the product to last longer than it did, or to be stronger than it was. Such proof, moreover, may often be relevant even when there is some evidence of a specific manufacturing flaw, especially where that evidence is disputed or inconclusive. Clearly, however, proof of high expectations as to product performance is not enough, standing alone, to make out a case of strict liability. The central fact in each case will be the failure of the product. In the present case, the tire blew out. In *Heaton v. Ford Motor Co.,* supra, a wheel collapsed shortly after striking a rock. The plaintiff in *Heaton* did not make a case for the jury because he was unable to show a specific manufacturing flaw or defect in design which was responsible for the collapse. He was also unable to prove that wheels on vehicles like his are normally expected to be strong enough to withstand high-speed impacts with large rocks. Such evidence, had it been available, would have been admissible to show that the product's failure—the col-

lapse of the wheel—was probably the result of some defect in construction or design for which the manufacturer ought to be held liable.

I find the majority opinion unacceptable because it elevates evidence of consumer expectation into an alternative doctrinal basis for § 402 A liability.

Strict products liability, as embodied in § 402 A, is a means of providing compensation for injured consumers by allocating the costs to the enterprise responsible for the manufacture and sale of the product. Its justification is found in the consumer's need for protection and in the ability of the enterprise to spread the risk by treating the costs of user injuries as a cost of doing business.

Comment c to § 402 A clearly recognizes this basis for the seller's liability:

> "On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products." Restatement of Torts 2d at 349-350.

As Professor Keeton has expressed it,

> "* * * No doubt the tremendous technological

advances that have occurred in recent years resulting in a proliferation of chemical products and drugs increasing the incidence of injuries from the use of products is one factor creating pressures for the imposition of strict liability. Another factor is, to be sure, the alterations that have occurred in this century as regards the manufacturing and marketing processes. Legal entities with mammoth accumulations of capital, large volume of sales, and national advertising are typical. This has led to the view that such entities are capable, if held responsible, of passing on to users generally losses suffered by the few. Thus there has come about a wider acceptance for the view that when the benefits to the many come at a high cost to the few, the many should pay for these losses. * * *" Keeton, *Products Liability—Liability Without Fault and the Requirement of a Defect,* 41 Tex L Rev 855, 856 (1963).

As the majority recognizes, the liability of the enterprise is kept within reasonable bounds by the requirement of a defect in the product. This requirement prevents the seller's liability from being absolute, and its definition has been recognized as a question of policy. Dickerson, *Products Liability: How Good Does a Product Have to Be?,* 42 Ind L J 301, 302-303 (1967); Keeton, op. cit. at 858-859. It is the essence of the seller's duty, imposed by law, to furnish a reasonably safe product. I believe the majority opinion, with its emphasis on warranty rationale and the concept of an implied representation, obscures this important point.

The standard of the reasonable expectations of consumers is employed in the comments to § 402 A only as a means of defining a defect. Consumer expectations are facts which the courts will, naturally, use in defining the scope of strict products liability. Such expectations have many sources in addition to

·the seller's representations about the product. In a proper case, evidence of actual representations, either express or "implied in fact," will be relevant to a determination of what consumers have a right to expect of the particular product. Nevertheless, a seller who has made no representations whatsoever will be liable for injuries caused by his failure to furnish a reasonably safe product. There is no need, in the analysis of a strict liability case under § 402 A, for the fictional notion that putting a product on the market involves any implied representations as to its quality.

In spite of the role of the doctrine of implied warranty in its developmental history, strict products liability is *sui generis*. It is not now, whatever its history, a representational tort. The gist of the tort is not a misrepresentation, but the sale of an unsafe product. Representations by a seller, when relevant, are important only to show that the product ought to have met a particular standard of safety. They are not theoretically necessary in any way to the imposition of strict liability on sellers generally.

In the present case I agree with the majority that plaintiff's evidence was sufficient to take his case to the jury on the theory of strict liability. My conclusion is based, not on any representation implicit in the sale of the tire, but on evidence which would permit the jury to infer that there was a flaw in the casing when the tire was sold.

There was, in the first place, evidence that the tire had not simply worn out under normal use. It had been driven for only eight or nine months, for a total distance of about 5,000 or 6,000 miles, and about 40 percent of the tread remained at the time of the

accident. Plaintiff testified as to the performance he expected from the tire:

> "A Well, normally you buy a tire like that, I figured I should get at least twelve to fifteen thousand miles under normal useage."

Defendants' expert witness, when asked on cross-examination what performance users can expect from a recapped tire, replied:

> "They expect to get the same service as the new tires that they had previously."

The jury, from this evidence, would have been justified in finding that the ordinary purchaser of a recapped tire could reasonably expect that, given normal use, it would not blow out as soon as this tire did.

There was also evidence from which the jury could find that the tire had not been damaged or unduly weakened after its purchase by plaintiff. Plaintiff testified that the tire was always kept properly inflated, that it had been driven almost exclusively on paved roads, and that it had not been subjected to any impacts which could have weakened the casing.

Finally, there was evidence from which the jury could infer that the tire contained a specific defect at the time of recapping and sale. Plaintiff's second expert witness, an experienced tire recapper, testified that the blowout did not appear to have been caused by impact. The probable cause of the tire's failure, he testified, was

> "* * * that there has been such as a small pin hole where air has seeped through from the inside of the casing out to the fabric or cords of the tire which has caused a bubble or air pocket that eventually the tire would stand no more and blew out or exploded; or, number two, possibly an air pocket

in the tire from original manufacture that over a period of time, with the heat and flexing of running the tire, could have developed gases and expanded and done the same thing.

\* \* \* \* \*

"Q * * * Now based on your experience could you give us an opinion, based on a reasonable scientific probability, whether this pin hole or the air hole were in the casing at the time of manufacturing?

"A That would be awful hard for me to determine by looking at the tire."

Although the witness was unable to determine from looking at the tire whether the casing contained an air pocket or hole at the time it was recapped, he nevertheless testified that such a condition was the probable cause of the blowout. This evidence, together with plaintiff's testimony that the tire had not been subjected to any unusual use or impact after he purchased it, would permit the jury to infer that when the casing was recapped it contained either an air pocket, a hole, or a weak spot which permitted a hole and then an air pocket to form during normal use. It could further properly find that if any of these three conditions existed, it constituted a defect which made the tire unreasonably dangerous.

It is not necessary in this case to explore the outer limits of the meaning of "defective." I would not permit the jury, in a case like this one, to find that the tire was defective simply because plaintiff suffered a blowout during the expected life of the tire. Tires wear out at different rates depending on their initial quality, their maintenance, and the uses made by the consumer. They are exposed during use to many hazards which may contribute to premature fail-

ure, and blowouts may occur in the total absence of manufacturing flaws. Plaintiff's evidence in this case, however, tended to exclude other causes and to indicate the probability of a flaw at the time of sale as the cause of the blowout. For an analysis of the various kinds of evidence which may, in combination, be sufficient evidence of a defect, see Rheingold, Proof of Defect in Product Liability Cases, 38 Tenn L Rev 325 (1971).

Cases from other jurisdictions involving tire blowouts show similar results. Where the only evidence tending to show the cause of the failure was that the tire blew out, the jury will not be permitted to find that the tire was defective at the time of sale. See, e.g., *Shramek v. General Motors Corp., Chevrolet M. Div.*, 69 Ill App 2d 72, 216 NE2d 244 (1966); *Williams v. U. S. Royal Tires*, 101 S2d 488 (La App 1958); *Wojciuk v. United States Rubber Co.*, 19 Wis2d 224, 120 NW2d 47, 6 ALR3d 1357 (1963). But where, in addition to the unexpected blowout, there is some evidence tending to show the probability that it was caused by a defect in manufacture, it has been held that there was a question for the jury. See, e.g., *Smith v. Uniroyal, Inc.*, 420 F2d 438 (7th Cir 1970); *Craig v. Burch*, 228 S2d 723 (La App 1969).

When a manufacturer or merchant sells a recapped tire containing a flaw which results in a blowout, during normal use and well within the limits of the tire's expected life as indicated by the remaining tread, I would hold that the tire is "defective" and that the cost of the resulting injuries should properly be borne by the enterprise. Having concluded that the evidence in this case was sufficient to permit the jury to make such a finding, I agree that the judgment must be reversed and the case remanded for a new trial.

DENECKE, J., dissenting.

I concur in the rationale for the decision of products liability cases stated by the majority. I dissent, however, because I am of the opinion that the trial court was correct in granting defendant's motion for a directed verdict.

This is a case in which it probably is the court's function, rather than the jury's, to decide whether the recapper and others in the chain impliedly represented that the used casing on the recap would perform as good as a new casing. I am using the distinction between the function of the court and jury in products liability cases proposed by Mr. Chief Justice O'CONNELL in his concurring opinion in *Cornelius v. Bay Motors,* 258 Or 564, 577, 484 P2d 299 (1971):

> "* * * This is the court's function of looking at the *general* character of men's dealings in the market place and deciding whether, as a normal course of such dealings, it is ordinarily understood by sellers and buyers that the seller represents, in effect, that he has inspected the car not only for patent defects but also defects which would be disclosed only by tearing down parts of the car in search for them." 258 Or at 581.

That opinion continues, "I do not think that this is the understanding of either buyer or seller in the usual sale of used cars." 258 Or at 581. Similarly, I do not think this is the understanding of the buyers or sellers of used tire casings.

Buyers of a recapped tire know they are getting a used casing. If buyers of recaps believe they will receive the same performance as they would from a new casing, why would anyone purchase new tires for which they must pay substantially more. I sup-

posed the reason why recaps sold for substantially less than new tires was that the buyer did not expect the same performance from a recap.

In my opinion the law should be that a retreader is liable for any defect in the casing that the retreader could have discovered by a reasonable inspection; that is, liable for negligence, and no more.

That the retreader selected this casing for retreading only implies to me that the retreader found no defect. That the retreader put on tread which would last more than 6,000 miles implies that the retreader, as well as the purchaser, expected that this tire, and most others, would perform for more than 6,000 miles. This, however, does not negate the expectation that inasmuch as used casings were retreaded, the incidents of failure will be substantially greater than with new tires.

We should attempt to apply § 402A of the Restatement (Second) of Torts so as to be consistent with the Uniform Commercial Code. *Cornelius v. Bay Motors,* supra (258 Or at 578). Comment 3 to ORS 72.3140, the Uniform Commercial Code section on implied warranties, states: "A contract for the sale of second-hand goods, however, involves only such obligation as is appropriate to such goods for that is their contract description." I believe a warranty that a used tire casing does not have a latent defect is not "appropriate" to such goods.

If this is a case like *Heaton v. Ford Motor Co.,* 248 Or 467, 435 P2d 806 (1967), and it is normally a jury question whether this particular used casing performed as impliedly represented, I am also of the opinion that the trial court was correct. I interpret *Heaton* as holding that in a case such as this a jury

cannot pass on this question without some evidence to guide it. In the present case there was no evidence to guide the jury in determining what was impliedly represented in making the sale of the recap. With this void the issue should not have been permitted to go to the jury.

BRYSON, J., dissenting.

The specially concurring opinion of Mr. Justice McALLISTER states:

"* * * However, because I am unable to agree with the effort of the majority to rest § 402 A liability on two separate inconsistent bases I am filing this separate opinion. The majority concept of a dual theory of § 402 A liability permeates the opinion, but is epitomized by the following statements:

"'In addition to the enterprise liability rationale, something similar to the rationale behind an implied representation of merchantable quality also has to be part of the theoretical basis for the rule. * * *

"* * * * *

"'Both rationales, that of a representational tort and that of enterprise liability, have their place in Section 402A. * * *'"

I cannot agree with the concept that Section 402A of the Restatement (Second) of Torts is based upon "enterprise liability" which has come to mean the manufacturer's ability to spread the risk and loss by adding the cost of the loss or the price of product liability insurance protection to the manufactured article's sales price; that manufacturers with national and international sales organizations can thereby distribute this loss to all of the consumers of its product for the benefit of the few who suffer.

This may be a fine economic theory but it has no

place in the law where the courts are seeking justice based on fault or innocence. It may justify the rule but it cannot be the reason for creating it.[1]

In fact, I have trouble accepting as a fact that Section 402A was a "restatement" of the law as it existed in 1964, when adopted. At that time there were only two cases to support it, namely, *Greenman v. Yuba Power Products, Inc.*, 59 Cal 2d 57, 27 Cal Rptr 697, 377 P2d 897 (1963), and *Goldberg v. Kollsman Instrument Corp.*, 12 NY2d 432, 240 NYS2d 592, 191 NE2d 81 (1963). Writers have reported that the section was merely the idea of Professor William Prosser, Reporter for the Restatement. At the time of its adoption, numerous writers criticized Section 402A as not being in accord with common law authority and on the further ground that it might subsequently be inconsistent with the Uniform Commercial Code. See 22 Stan L Rev 715 (1970).

This court has undoubtedly, like most other courts, adopted Section 402A but we specifically rejected enterprise liability or the spreading the risk theory in *Wights v. Staff Jennings*, 241 Or 301, 405 P2d 624 (1965). To my knowledge, we have not embraced this concept in any opinion where we have found liability or denied liability on the basis of Section 402A.[2] As stated by Dean Prosser,

> "The courts are going to be compelled to make up their minds as to what they are trying to do. Are they adopting a so-called socialistic theory, a

[1] For criticism of the theory of "spreading the risk," see Plant, *Strict Liability of Manufacturers for Injuries Caused by Defects in Products—An Opposing View*, 24 Tenn L Rev 938; 945 (1957); Prosser on Torts 673, n 44 (3d ed 1964).

[2] In Macomber v. Cox, 249 Or 61, 66, 435 P2d 462 (1968), we rejected "enterprise liability."

compulsory insurance, risk distribution and so on? Or are they going to adopt the theory that this thing is justified by the defendant's conduct in putting the product on the market, and representing to the public that it is fit for use? Prosser, Products Liability in Perspective, 5 Gonzaga L. Rev. 157, 170 (1970)."

At this point of time in the evolution of this new concept of liability, I am not willing to place the court in a position of adopting a law based on a socialistic theory. Regardless of which theory of law, negligence or implied warranty of merchantable quality, claims the progenitorship, a new remedy of strict products liability was created by our adopting Section 402A in order to give justice to those cases involving mass production and sale of defective products to consumers.

In adopting Section 402A we created a new remedy of strict products liability, but we should not say that we have eliminated fault as a prerequisite to liability under this theory[3] nor do we make the manufacturer-retailer an insurer subject to *absolute* liability.[4]

I dissent from the result reached by the majority. When the parties rested, the defendants moved "the court for an order directing a verdict for defendants upon the grounds that there is no substantial evidence that the defendants, or either of them, were negligent in any of the particulars charged in

---

[3] *See* Cochran v. Brooke, 243 Or 89, 94, 409 P2d 904 (1966), and concurring opinion by Chief Justice O'Connell in State ex rel Western Seed v. Campbell, 250 Or 262, 282-84 (1968).

[4] Cowan, *Some Policy Bases of Product Liability,* 17 Stan L Rev 1077, 1089-90 (1965).

the complaint and upon the further ground that there is neither proof nor pleading that there was a defect in the tire at the time the tire left the hands of the defendant." The majority opinion agrees that "[t]he testimony of plaintiff's witnesses did not substantiate in any way any of the allegations of negligence in the complaint. As a result, plaintiff failed to sustain his negligence count," but concludes that plaintiff's second expert witness, Robert McCann, an experienced tire recapper, testified "that the small hole and resultant air pocket, which the witness said caused the blowout, came into existence subsequent to the retreading of the tire and its sale to plaintiff."

The following is testimony of Mr. McCann:

"* * * that there has been such as a small pin hole where air has seeped through from the inside of the casing out to the fabric or cords of the tire which has caused a bubble or air pocket that eventually the tire would stand no more and blew out or exploded; or, number two, possibly an air pocket in the tire from original manufacture that over a period of time, with the heat and flexing of running the tire, could have developed gases and expanded and done the same thing.

"Q * * * Now based on your experience could you give us an opinion, based on a reasonable scientific probability, whether this pin hole or the air hole were in the casing at the time of manufacturing?

"A That would be awful hard for me to determine by looking at the tire."

Defendant's expert witness, Jarley Pete, testified that the tire failure "appears to be a rupture from an impact that occurred" and, also, that the tire was not defective at the time of its manufacture.

Comment *g* to Section 402A of Restatement (Second) of Torts states:

> "* * * The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained."

Witness McCann was unable to say that the tire was in a defective condition at the time it left the hands of the defendant seller. Witness Pete testified that the tire was not defective at the time of its manufacture. I do not believe the evidence submitted was sufficient to support an inference from which the jury might conclude that the tire was in a defective condition at the time it left the hands of the manufacturer or the defendant seller.

I would affirm the trial court.