Argued and submitted October 5, 1992, affirmed March 17, appellant's petition for reconsideration allowed by opinion June 9, 1993

See 121 Or App 21 (1993)

Shelia Kathy WATTS,
Conservator and Guardian for
Steven Boyd Isom, an incapacitated person,
*Appellant,*

*v.*

RUBBER TREE, INC.,
an Oregon corporation,
dba Oregon Tire and Supply,
*Respondent,*

*and*

BRIDGESTONE/FIRESTONE, INC.,
an Ohio corporation, formerly known as
Firestone Tire & Rubber Company;
Cooper Tire and Rubber Co.,
a Delaware corporation;
and Michael Ray Wright,
*Defendants.*

(90-0105-L-3; CA A71740)

848 P2d 1210

George W. Kelly, Eugene, argued the cause for appellant. With him on the briefs was Clinton D. Simpson, Eugene.

Richard Butler, Eugene, argued the cause for respondent. With him on the brief was Patrick J. Kouba, Eugene.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

WARREN, P. J.

## WARREN, P. J.

In October, 1989, Isom was seriously injured when he was thrown out of a truck after the driver, Wright, lost control as a result of a blowout of a recapped tire. Isom, through his conservator and guardian, Watts (plaintiff), sued Rubber Tree, Inc., the tire recapper (defendant), the tire manufacturers, and Wright. The theories of recovery against defendant were negligence and strict liability. The trial court granted a directed verdict in favor of defendant on both counts.[1] ORCP 60. Plaintiff appeals, and we affirm.

■■ A directed verdict is proper only when reasonable people could draw but one conclusion from the evidence. *James v. Carnation Co.*, 278 Or 65, 69, 562 P2d 1192 (1977). We view the evidence in the light most favorable to plaintiff. *Paulson v. Western Life Insurance Co.*, 292 Or 38, 40 n 1, 636 P2d 935 (1981).

The tire that failed was manufactured in 1985. On August 24, 1989, Wright's employer, C.W. Lot Sweeping Service (Sweeping), took four used tires to defendant for recapping. Defendant inspected them and rejected two of them as unsuitable for recapping. It then selected two casings from its own stock to replace the rejected ones. All four were then recapped. The tire that failed was recapped with a casing supplied by Sweeping. Defendant charged $10 each for the casings it supplied, but made no charge for those provided by Sweeping. It also charged $241.80 for the four treads and the recapping service. For the first 25 percent of tread wear, defendant provided a limited warranty for repair and replacement on both the recaps and the casings. The problem with the failed tire was that, before it was recapped, it had a separation between the two steel belts that were encased in a rubber sheet at the edge of the casing. The separation, in conjunction with improper adhesion, caused the tire to blow out.

■ The first question is whether a jury could have found defendant negligent for failing to discover the separation.

---

[1] After the trial court granted directed verdicts in favor of defendant, the trial continued against the remaining defendants. This appeal concerns only the directed verdicts in favor of defendant.

On direct examination, Baumgardner, one of plaintiff's expert witnesses, testified that the tire in question was "a prime candidate for retreading." He said that, according to the Rubber Manufacturers Association's guidelines, the tire should not be recapped if it had a tread or belt edge separation. However, he did not believe that the separation "would have been detectable during the retreading process."

On cross-examination by the tire manufacturers' attorney, Baumgardner said that the tire appeared to have no separation when manufactured, but that it had at least a one inch or maybe two inch separation when recapped in 1989. He further testified:

"Q * * * Now, is that two inch belt separation just as it sounds, right at the belt edge?

"A It moved inward in the belt edge between the belts.

"Q All right. Now, how much of a belt edge separation would there need to be before you would expect a retreader to pick it up?

"A It depends on how close he buffs to the belt. The problem is that your outer steel belt acts just like a belt holding the separation down, and it's relatively hard to see and I really can't tell if this would be readily visible to him or not.

"Q Well, wouldn't you expect that a retreader would pick up a belt edge separation that was a quarter of an inch or more?

"A No.

"Q Isn't it true that you testified to that effect in the Cravine (phonetic) vs. Firestone case in 1987?

"A Was that a passenger tire or truck tire?

"Q It was a truck tire, I believe. Does that make a difference in your answer?

"A Yes, basically, I think it would be more difficult to find in a truck tire because they characteristically have a heavier base gauge on them.

"Q All right. So if the Cravine (phonetic) was indeed a truck tire casing, you would expect that it would be harder to pick up a belt edge separation because of the structure of the truck tire?

"A  Yes, you have more rubber over the top of the belt, and that has more of a tendency to hide it, whereas, *a passenger tire has an extremely thin layer of base gauge under there, and it has to be buffed extremely close to the belt, and they will usually pick up a separation of a quarter of an inch.* In a truck tire with more base gauge it hides a little better because you've got this extra rubber under the grooves.

"Q  Okay. Do you recall being asked this question and giving this answer in the Cravine (phonetic) case in July of 1987?

"  'Q  You said earlier, Mr. Baumgardner that if the tire had a separation of more than a quarter of an inch, that the retreader could have picked it up in the normal retreading process?'

"  'A Yes.'

"A  I probably did say that. *I still think we are talking about a passenger tire, however.* At this point, it's hard to recall exactly what the circumstances or what the lead-in or following questions were.

"Q  If a retreader did not pick up a belt edge separation of a quarter of an inch or more, would you expect that the retreader had not done his job?

"A  I would think that the retreader should be able to find separations much in excess of a quarter of an inch, but again, it's a function of the size of the tire and the base gauge.

"Q  All right. Now, this is a light truck tire, right?

"A  Yes.

"Q  And it's not as large and doesn't have as much rubber as the truck tires that you were talking about a few minutes ago?

"A  That's correct, but it does have substantially more rubber than a passenger tire." (Emphasis supplied.)

Plaintiff characterizes Baumgardner's testimony on direct and cross-examination as inconsistent. She argues that the jury could have believed one part of Baumgardner's testimony while disbelieving some other part and thus could have found defendant negligent for failing to discover the belt separation. Plaintiff mischaracterizes the evidence.

There is no contradiction in Baumgardner's testimony. His testimony on direct examination was that the

separation would not have been detectable. Although on cross-examination he agreed that he had testified in an earlier, unrelated case that a retreader would usually "pick up" a separation greater than a quarter of an inch, he made it clear that that was true only with respect to a passenger tire, not to the light truck tire that was at issue. There is simply *no* evidence from which a jury could have found defendant negligent for failing to discover the separation. *See Markle v. Mulholland's, Inc.*, 265 Or 259, 262, 509 P2d 529 (1973); *Van Den Bron v. Fred Meyer, Inc.*, 86 Or App 329, 331, 738 P2d 1011 (1987). The trial court correctly granted a directed verdict on the negligence claim.

■■   The next question is whether defendant is strictly liable for the injuries caused by the recapped tire. ORS 30.920 provides, in part:

"(1)   One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

"(a)   The seller or lesser is engaged in the business of selling or leasing such a product[.]"

Under that statute, only a "seller" who "sells" a defective product may be strictly liable. *See also Markle v. Mulholland's, Inc., supra*, 265 Or at 284 (McAllister, J., specially concurring); *Royer v. Miles Laboratory, Inc.*, 107 Or App 112, 117, 811 P2d 644 (1991); *Davis v. Pacific Diesel*, 41 Or App 597, 604, 598 P2d 1228 (1979), *rev den* 288 Or 253 (1980). Plaintiff does not dispute the general proposition that strict liability cannot lie without there having been a sale of a defective product, but argues that there was such a sale in this case. She relies on *Markle v. Mulholland's, Inc., supra*. We disagree.

In *Markle*, the defendant, a tire recapper, *sold* the plaintiff a recapped tire. The plaintiff was subsequently injured in a car accident when the tire blew out. He sued the recapper, the wholesaler and the retailer, claiming that they were strictly liable. The trial court granted the defendants' motion for a directed verdict. At issue was whether the defendants were strictly liable for injuries caused by a sold recapped tire. The Supreme Court adopted the theories of

enterprise liability and representational liability as the basis for the law of strict product liability, and concluded that there was sufficient evidence to permit a jury to infer that the recapped tire was unreasonably dangerous.

■     This case is different. Defendant did not sell the defective casing. Sweeping asked defendant to recap the tires it supplied. Defendant merely provided a service when it affixed the new tread to the casing. ORS 30.920 does not provide for strict liability of service providers. If the legislature had intended otherwise, it would have clearly said so. *See Johnson v. Water Sausage Corp.*, 83 Or App 637, 641, 733 P2d 59, *rev den* 303 Or 590 (1987); *cf. Lemley v. J & B Tire Co.*, 426 F Supp 1378, 1379 (WD Pa 1977). Because there was *no* sale of a defective product, defendant cannot be liable under ORS 30.920.

Plaintiff nonetheless argues that defendant sold a completed product, the retreaded tire, which she asserts "is much more than a sale of materials." She argues that the transaction also included "the sale of labor, of technical know-how, and of a process that is beyond the consumer's ability to duplicate."[2] The argument is essentially that defendant sold a service; it is similar to ones that have been rejected. In *Hoover v. Montgomery Ward & Co.*, 270 Or 498, 528 P2d 76 (1974), a tire retailer sold the plaintiff's husband a tire, placed it on the spare wheel and mounted the wheel on the car. The plaintiff was subsequently injured in a car accident. She sued the tire retailer in strict liability. She did not argue that the tire sold to her husband was defective. Rather, she argued that the product sold, which she alleged included the tire and the *installation* of it, was defective. The Supreme Court rejected that argument. It distinguished *Newmark v. Gimble's Inc.*, 54 NJ 585, 258 A2d 697 (1968), where the court held that a beauty shop was strictly liable under an implied warranty of fitness when defective permanent wave lotion was applied to a patron's hair. The Supreme Court pointed out that, in *Newmark*, it was the product, as opposed to the service, that was defective but that, in *Hoover*,

---

[2] Plaintiff also argues that the limited warranty provided by defendant on the cap and the casing indicates that there was a sale of the complete tire, for "[o]ne does not guarantee a product that is not being sold." That assertion is only partially accurate, because one who provides a service often guarantees its quality.

it was the installation service, not the tire sold, that was defective. The court concluded that it was not proper to apply strict liability.

We reached a similar result in *Davis v. Pacific Diesel, supra.* There, the defendant, a diesel engine service company, sold to FMC, the plaintiffs' employer, a rebuilt diesel engine for a compressor. As part of that transaction, the defendant also installed the engine and transferred the automatic shutdown system from FMC's old engine to the newly rebuilt one. Two persons were killed and two others were seriously injured in an accident as a result of defects in the shut-down system. Actions were brought against the defendant in strict liability. We said that to prevail on their count in strict liability the plaintiffs must have proved, *inter alia*, that defendant *sold* FMC a product that was defective and unreasonably dangerous. We concluded that strict liability did not lie:

> "Here, plaintiffs do not contend that the product sold to FMC by defendant, the rebuilt engine, was defective. Rather, their complaints allege that as a result of defendant's failure to install a functional shut-off system, which it had merely transferred from the old engine, 'the compressor unit was dangerously defective and unreasonably dangerous.' This is the same argument rejected in *Hoover v. Montgomery Ward & Co., supra.*" 41 Or App at 605. (Citations omitted.)

This case is not materially different from *Hoover* and *Davis*. It is undisputed that the products sold by defendant, the new tread and adhesive, were not defective. Rather, it was the casing supplied by Sweeping that was already defective. Plaintiff in essence is arguing that defendant was strictly liable because it had failed to discover the defect in the casing. That argument would require us to extend strict liability to a service transaction. Pursuant to ORS 30.920(1)(a), and under the authority of *Hoover* and *Davis*, we decline to do that.[3]

---

[3] Our holding is consistent with the approach adopted by a majority of other jurisdictions. *See, e.g., Counts v. MK-Ferguson Co.*, 862 F2d 1338, 1340 (8th Cir 1988); *Johnson v. William C. Ellis & Sons Iron Works*, 604 F2d 950, 955 n 5 (5th Cir 1979), *mod* 609 F2d 820 (1980); *Kaplan v. C Lazy U Ranch*, 615 F Supp 234, 238 n 3 (D Colo 1985); *Abdul-Warith v. Authur G. Mckee and Co.*, 488 F Supp 306 (ED Pa 1980); *aff'd* 642 F2d 440 440 (3rd Cir 1981); *Kodiak Elec. Ass'n v. Delaval Turbine, Inc.*, 694 P2d 150 (Alaska 1984) *reh'g den* 696 P2d 665 (1985); *Swenson Trucking,*

Affirmed.

*Etc. v. Truckweld Equip.*, 604 P2d 1113 (Alaska 1980); *but see, e.g., Gentile v. MacGregor Mfg. Co.*, 201 NJ Super 612, 493 A2d 647 (1985); *O'Laughlin v. Minnesota Natural Gas Co.*, 253 NW2d 826 (Minn 1977).