Argued and submitted May 28, affirmed August 21, petition for review allowed December 17, 1996 (324 Or 487)

Victoria BROKENSHIRE,
*Respondent,*

*v.*

RIVAS AND RIVAS, LTD.,
an Oregon corporation,
dba Cascade Pacific Group,
*Appellant.*

(940100028; CA A87637)

922 P2d 696

Thomas A. Gordon argued the cause for appellant. With him on the briefs was Gordon & Polscer.

Ridgway K. Foley, Jr., argued the cause for respondent. With him on the brief were M. Elizabeth Duncan, Foley & Duncan, P.C., and James D. Huegli.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

Landau, J., dissenting.

## LEESON, J.

In this strict product liability case, a jury awarded plaintiff, a baker and cake decorator, compensatory damages for the serious back injuries she sustained when she slipped and fell on a floor that was sold and installed by defendant at the bakery where plaintiff worked. Defendant appeals, asserting four assignments of error. We write to address two of those assignments and affirm.

Birnbach, the owner of the bakery in which plaintiff worked, received several citations from the Oregon Department of Agriculture for the unsanitary condition of the bakery's concrete floor. Over the years the floor had absorbed spilled oils and other baking ingredients and had become very "punky" (soft) and "rubbly" (resembling rubble) in places. Birnbach contacted defendant about having a new floor installed. Defendant, "a dealer in new flooring systems," offered floors of several types, including epoxy, acrylic, polyurethane and polyester. Birnbach selected acrylic, because the state inspector had told him to purchase an acrylic floor. Defendant showed Birnbach several product samples of Silical acrylic floors that varied in color and texture. According to Birnbach, he selected the sample that met his criteria for cleanliness and a nonskid surface.

On August 7, 1991, Birnbach and defendant entered into a contract for the sale and installation in the bakery of a "Silical acrylic floor system" like the sample Birnbach had selected, to be finished with two coats of clear sealer. On August 25, defendant commenced work. The bakery equipment was moved out and the existing concrete floor was "shot blasted" with a specialized machine that removed the loose and decaying concrete from the surface of the old floor, leaving a "sound," abraded surface to which the new floor could adhere. Defendant applied a low-viscosity prime coat and allowed it to soak into the abraded concrete, to serve as an anchor for the new floor. Defendant then spread a thicker coat of a viscous resin that filled in contours to create a uniformly flat surface. While the resin coat was still wet, defendant broadcast acrylic flakes over the entire area. In order to match the color and texture of the sample that Birnbach had

selected, defendant had to mix several types of acrylic flakes in the specified proportions. By design, only a portion of the flakes that are applied are intended to stick to the wet resin; the remainder are vacuumed away after the resin coat has cured. The embedded flakes provide the nonskid texture of the floor. Finally, defendant applied two thin coats of sealer to finish the floor. The entire process took several days. The new floor was approximately 1/16" thick, although the thickness varied because of the inherent unevenness of the concrete substrate.

Almost immediately after its completion, several bakery employees complained to Birnbach that the new floor differed considerably from the sample. They described it as "very slippery," "extremely slick" and "like walking on ice." A few employees reported that they had fallen and most attempted to adapt to the smooth surface by walking in a manner that they dubbed the "bakery shuffle." Birnbach complained to defendant. Defendant responded by patching several areas where the new floor had not bonded properly to the underlying concrete, but it did nothing to alter the floor's smooth, slippery surface.

On January 11, 1993, plaintiff slipped, fell and severely injured her back while carrying a 50-pound lug of whipping cream from a walk-in cooler. She subsequently underwent four surgeries and was unable to return to her former bakery job. She brought this action, alleging in her amended complaint that defendant is strictly liable for her injuries under ORS 30.920:

> "At all times mentioned herein, defendant was a seller of a product as defined by ORS 30.920, said product being the installation of the overlay of the floor. The product was in a defective condition, unreasonably dangerous to the plaintiff, who was a user of said product. The floor reached the ultimate users without substantial change in the condition in which it was sold."

The trial court entered judgment for plaintiff after a jury found that "the floor installed by defendant [was] unreasonably dangerous for its intended use in the production bakery" and awarded her almost $430,000 in economic damages,

including medical expenses, lost wages and loss of future earning capacity, and $300,000 in noneconomic damages.

■ Defendant assigns error to the trial court's denial of its motion for a directed verdict, arguing that "defendant's installation of flooring was not a 'product'" under ORS 30.920. It first argues that the floor it installed should not be considered a product, because it is permanently affixed to real property. It asks us to adopt a *per se* rule that "improvements to realty do not constitute 'products' for purposes of strict liability in tort." We decline to do so. Defendant's argument relies on several cases from other jurisdictions that are distinguishable or that fail to adopt such a *per se* rule. *See, e.g., Menendez v. Paddock Pool Const. Co.*, 172 Ariz 258, 836 P2d 968 (App 1991) (holding that custom designed in-ground swimming pool is not a "product" for strict liability purposes, but rejecting a *per se* rule excluding structural improvements to realty and acknowledging cases allowing strict liability for products incorporated into an improvement in realty). We discern no convincing bases for the categorical exclusion that defendant urges us to adopt.

Defendant next argues that the "trial court erred in reviewing this case as involving a 'product' rather than a service."[1] According to defendant, plaintiff's strict product liability complaint, alleging that defendant's "installation of the overlay of the floor" was a defective product that was unreasonably dangerous, presupposes that the "installation of custom flooring in [the] bakery was a 'product' falling within the ambit of Oregon's civil product liability statute." It relies on *Watts v. Rubber Tree, Inc.*, 118 Or App 557, 848 P2d 1210, *on recons* 121 Or App 21, 853 P2d 1365, *rev den* 317 Or 272 (1993), and *Hoover v. Montgomery Ward & Co.*, 270 Or 498, 528 P2d 76 (1974), to support its contention that liability under ORS 30.920 does not extend to the service it performed.

---

[1] Plaintiff contends that defendant's argument "that it provided a 'service' rather than a 'product'" was not raised below. However, defendant's motion for a directed verdict was grounded on the theory that this is "a contract case and not a defective product case," and the trial court considered the question of whether the installation of the floor constituted the sale of a product.

■ Oregon's codification of the law governing product liability actions, *see* ORS 30.900 to ORS 30.927 (defining actions, procedural limitations, strict liability principles and punitive damages), extends strict liability to "[o]ne who *sells* * * * *any product* in a defective condition unreasonably dangerous to the user" for any injury to the user, if the seller is in the business of selling that product. ORS 30.920.[2] (Emphasis supplied.) We accept defendant's contention that it is a question of law whether its installation of the acrylic floor in the bakery is a "product" under ORS 30.900 *et seq. See Sease v. Taylor's Pets*, 74 Or App 110, 115, 700 P2d 1054, *rev den* 299 Or 584 (1985) (whether live animal sold by pet shop is a "product" under ORS 30.900 *et seq*). However, this case might more accurately be described as involving a hybrid transaction that is partly the rendering of a service and partly the sale of a product. *See Newmark v. Gimbel's Incorporated*, 54 NJ 585, 258 A2d 697 (1969) (characterizing sale and application of permanent wave solution by a beauty shop operator as a hybrid transaction and holding beauty shop strictly liable for customer's injuries that resulted).

The cases cited by defendant for the proposition that its installation of the floor constituted a service rather than the sale of a product also involve hybrid transactions but have significant factual differences. In *Watts*, the plaintiff was seriously injured when the driver of his employer's truck, in which the plaintiff was riding, lost control when a recapped tire blew out. The tire had failed because of a defective casing that was supplied by the plaintiff's employer. We observed that

> "[the] problem with the failed tire was that, before it was recapped, it had a separation between the two steel belts that were encased in a rubber sheet at the edge of the casing. The separation, in conjunction with improper adhesion, caused the tire to blow out." *Watts*, 118 Or App at 559.

We held that the tire recapper was not strictly liable under ORS 30.920, because it did not sell the defective casing. It

---

[2] ORS 30.920 enacted *Restatement (Second) of Torts*, section 402A, with only minor changes that are not relevant here, and expressly states the legislature's intent that the statute be construed in accordance with Comments a to m of that section. ORS 30.920(3).

merely provided a service when it affixed a new tread to the defective casing. Strict liability does not extend to service providers. *Id.* at 563. Our opinion in *Watts* carefully distinguished *Markle v. Mulholland's, Inc.*, 265 Or 259, 509 P2d 529 (1973), in which the defendant, a tire recapper, had sold the plaintiff a recapped tire that included the casing. In that case, the Supreme Court held that the plaintiff's strict product liability claim should have been allowed to go to the jury for a determination of whether the recapped tire was unreasonably dangerous. *Id.* at 270-73.

The dissent contends that *Watts* is analogous to this case. 142 Or App at 567-68. We disagree. In *Watts*, the defect that caused the accident was the casing that had been provided by the plaintiff. We held that the defendant, who applied the tread, could not be held strictly liable, because it did not sell the tire casing. In this case, there is no allegation that it was a defect in the concrete substrate that caused plaintiff's injury. The defect was in the slippery floor installed by defendant, a defect that made it dangerous for its intended use. *Watts* might be an apt analogy to this case if the defect were in the concrete substrate. *Markle*, not *Watts*, provides the more apt analogy.

The other case on which defendant relies is *Hoover*. There, the plaintiff was injured in a one-car accident after she purchased new tires from the defendant. She alleged that in mounting the wheels on her car, the defendant had failed to properly tighten the lug nuts on one of the wheels. 270 Or at 499. The plaintiff did not contend that the tire sold by the defendant was defective, nor that it was improperly installed on the wheel. *Id.* at 500. Citing *Newmark*, the court observed that in all sales-service hybrid cases, strict product liability requires that the product, as opposed to the service, must be defective. *Id.* at 501. Because the tire sold by the defendant was not dangerously defective, the court held that the defendant could not be held strictly liable for negligently mounting the wheel on the plaintiff's car. *Id.* at 502.

In this case, as we have previously stated, defendant, a dealer in new floors, both sold the acrylic floor and performed the service of installing it in Birnbach's bakery. For plaintiff to prevail, her injury must have resulted from a

dangerous defect in the floor itself, rather that its improper application to the existing concrete substrate. *Hoover*, 270 Or at 501. The distinction between the two in this case is problematic, because the floor itself did not exist until it was applied to the concrete substrate. However, *Jamison v. Spenser R.V. Center, Inc.*, 98 Or App 529, 779 P2d 1091 (1989), resolves the matter.

In *Jamison*, the defendant had sold and installed a trailer hitch on the plaintiff's truck. Installation consisted of assembly, which included welding the component parts of the hitch. 98 Or App at 531. The plaintiff lost control of his truck while towing a trailer and was injured in a multi-vehicle accident when one of the welds made during installation of the trailer hitch failed. *Id.* The plaintiff argued that he had alleged that the accident was caused by the defendant's negligent installation of a nondefective product, not by a product defect, and therefore that the 10-year statute of limitation in ORS 12.115 applied, rather than the eight-year limitation for a defective product under ORS 30.905(1).[3] *Id.* at 532. We reasoned that it was unnecessary to distinguish defects created by assembly from improper installation, because the seller was required to customize each installation to the type of vehicle, making its role comparable to that of a manufacturer. *Id.* at 533 n 1. Consequently, we concluded that the plaintiff's allegations "if proved, would show that assembly and installation of the trailer hitch created a defect in the hitch, resulting in a defective product being sold to the plaintiff." *Id.* at 533.

Similarly, in this case, defendant was required to customize each Silical acrylic floor that it sold by applying the proper mix of acrylic flakes to the wet resin along with a finish coat of sealer to provide the desired combination of color, texture and surface. The process of making the acrylic floor need not be distinguished from its installation, because defendant's role was to manufacture on site the floor that it sold to Birnbach. It was the floor itself that was dangerously

---

[3] In *Jamison*, although the plaintiff did not plead strict liability, the court reasoned that a product liability civil action, as defined in ORS 30.900, embraces all theories in an action based on a product defect, including negligence, and examined the meaning of "product defect" under 30.900 *et seq.* 98 Or App at 531-32.

defective. The trial court did not err in denying defendant's motion for a directed verdict.

The dissent maintains that defendant merely resurfaced the bakery's concrete floor, and that therefore plaintiff's only basis for recovery is in negligence. 142 Or App at 568. The nature of the product that plaintiff purchased was that it had to be manufactured on site and applied over a concrete substrate that had been blasted to remove the old concrete surface. The new Silical acrylic floor was finished with two coats of sealer. The dissent would be more persuasive if all defendant had done was to apply sealer to the old concrete surface. The dissent seems to suggest that an action in strict product liability can lie only if a product is manufactured elsewhere and brought to the site where it is installed. Had defendant manufactured the Silical floor at defendant's warehouse, for example, and installed it at the bakery as pre-cut squares, strict product liability would be obvious.

Furthermore, the dissent simply assumes that the floor that defendant manufactured and installed was not defective. It then poses a variety of hypothetical examples, 142 Or App at 567-68, all of which presuppose negligent selection and application of a product that otherwise performs as manufactured. Those examples miss the point: In this case, plaintiff's allegation was that the new Silical acrylic floor was dangerously defective in that it was dangerous for its intended purpose.

■■ Defendant also argues that the trial court erred in failing to strike plaintiff's claim for impaired future earning capacity for lack of evidence about how the jury was to reduce that award to present value. Plaintiff presented testimony by a vocational expert about plaintiff's life expectancy, work years until retirement, projected lifetime earnings had she not been injured and expected earnings after injury based on her mental and physical abilities. The trial court instructed the jury, using Uniform Civil Jury Instruction 70.01, to reduce any award for future loss of earnings to present value. Defendant argued to the trial court that plaintiff was required to present some evidence of "discount rates or interest rates * * * [to] make a determination what amount invested today would return to the plaintiff the same

amount." The court rejected that argument, because the jury instruction specified "a reasonable rate of interest," which is information "within the purview of the common juror's experience." While it is true that determining the proper interest rate to apply over the course of 20 or 25 years may be difficult to predict, that is but one aspect of the mathematical calculation that must be performed in reducing an award for impaired future earning capacity to present value.[4] Both plaintiff and defendant would have been allowed, but were not required, to present expert testimony to advise the jury about the performance of the appropriate computation and the different assumptions that may be made to guide that computation. *Plourd v. Southern Pac. Transp. Co.*, 266 Or 666, 676-79, 513 P2d 1140 (1973); *see also Wilson v. B. F. Goodrich*, 292 Or 626, 631, 642 P2d 644 (1982) (assumptions and predictions about inflation, wage levels and interest rates needed to calculate present value of future earnings may be made by factfinder without expert assistance or on basis of expert testimony and challenged by cross-examination or contrary evidence). The trial court did not err in denying defendant's motion.

As noted at the outset, we affirm without discussion defendant's remaining assignments of error.

Affirmed.

**LANDAU, J.,** dissenting.

Defendant was asked to install an acrylic surface on an existing concrete floor located in a bakery. Defendant did so, applying off-the-shelf products, each of which performed as manufactured. The problem was that defendant either selected the wrong materials or misapplied them, and the surface that resulted was too slippery for safe use in a bakery. Plaintiff slipped on the acrylic surface and injured her

---

[4] In its brief, defendant calculated present value of plaintiff's loss of future earnings as the amount of money that, if invested today at an assumed interest rate, would grow to the total projected loss predicted by the vocational expert after 25 years. That is not the proper method. The correct procedure requires a determination of the amount that, if invested today at the assumed interest rate, would produce a stream of income over 25 years that compensates plaintiff annually for her reduced earning capacity.

back. She sued defendant, alleging as her sole theory of liability that defendant was strictly liable for installing an unreasonably dangerous product: a slippery floor. The issue before us is whether defendant's apparently negligent installation of acrylic materials that otherwise performed as specified supports a claim for strict product liability. The majority concludes that it does. I respectfully disagree. In my view, the facts in this case might support a claim for negligence, but they do not support a claim for strict product liability.

Four decisions provide the universe of relevant Oregon precedents from which we may derive principles to control the disposition of this case. The first is *Markle v. Mulholland's, Inc.*, 265 Or 259, 509 P2d 529 (1973). In that case, the plaintiff purchased a tire, which had previously been recapped. After an accident, the plaintiff sued the recapper, the wholesaler and the retailer of the tire. The Supreme Court held that the plaintiff's claim for strict product liability against all of the defendants could be submitted to the jury. *Id.* at 271.

The second decision is *Hoover v. Montgomery Ward & Co.*, 270 Or 498, 528 P2d 76 (1974), another defective tire case. The plaintiff purchased four tires from the defendant Montgomery Ward. The plaintiff was later injured in an automobile accident. She sued Montgomery Ward both in negligence and in strict product liability, alleging that Montgomery Ward had failed properly to tighten the lug nuts on one of the wheels when it installed the new tires. The trial court did not allow the strict liability claim to go to the jury. The Supreme Court affirmed. The court characterized the issue before it, and its disposition, in the following terms:

> "This case presents the question of whether the definition of 'dangerously defective product' should be expanded to include within the scope of strict liability the negligent installation of a nondefective product. We have found no court which has stretched the doctrine of strict liability in tort to this extreme, and we decline to do so.
>
> "* * * * *
>
> "In the instant case it is obvious that the product sold to plaintiff was not dangerously defective. Even if we accepted plaintiff's version of the cause of the accident, it was not a

dangerously defective tire which caused plaintiff's injuries, but rather the installation of the wheel on the hub and axle of the auto."

*Id.* at 501-02.

The third relevant decision is this court's in *Jamison v. Spencer R.V. Center, Inc.*, 98 Or App 529, 779 P2d 1091 (1989). In that case, the plaintiff purchased from the defendant a travel trailer and a trailer hitch to tow it. The defendant installed the hitch. That process included assembling the component parts, including welding the parts together and to the plaintiff's truck. One of the welds apparently failed, and the plaintiff was injured in an accident. Over eight years later, the plaintiff sued the defendant for negligence; he asserted no strict liability claim. The defendant moved for summary judgment on the ground that the plaintiff had asserted a strict liability claim well after the eight-year statute of ultimate repose for product liability claims had run. After noting that the product liability statute embraced product claims premised both in negligence and in strict liability, we concluded that the plaintiff's claim was indeed one for a defective product, a trailer hitch that had been negligently assembled. *Id.* at 531-33. In a footnote, we went on to add, by way of *dictum*, that

"[w]e do not distinguish defects created in the assembly of the trailer hitch from those made in the installation. The * * * 'instructional guide,' included in the summary judgment record, required the installer to customize each installation to the make and model of each car. The seller's role in assembling the hitch is comparable to that of a manufacturer."

*Id.* at 533 n 1.

The final decision is *Watts v. Rubber Tree, Inc.*, 118 Or App 557, 848 P2d 1210, *rev den* 317 Or 272 (1993), another defective tire case. A passenger was injured when he was thrown out of a truck after the driver lost control as a result of a blown tire. The tire previously had been taken to a recapper, which had installed a new surface on the used tire. The tire to be recapped contained a defect that hampered adhesion of the new tire tread. Unfortunately, the recapper did not notice the defect in the casing. The guardian of the

injured passenger sued, among others, the recapper, asserting that the recapper was strictly liable for injuries caused by the recapped tire. The trial court declined to allow that claim to be submitted to the jury. On appeal, the plaintiff guardian argued that the case was controlled by *Markle*. We disagreed:

> "In *Markle*, the defendant, a tire recapper, *sold* the plaintiff a recapped tire. * * * At issue was whether the defendants were strictly liable for injuries caused by a sold recapped tire. The Supreme Court adopted the theories of enterprise liability and representational liability as the basis for the law of strict product liability, and concluded that there was sufficient evidence to permit a jury to infer that the recapped tire was unreasonably dangerous.
>
> "This case is different. Defendant did not sell the defective casing. [The owner of the tire] asked defendant to recap the tires it supplied. Defendant merely provided a service when it affixed the new tread to the casing."

*Watts*, 118 Or App at 562-63 (emphasis in original).

The plaintiff nonetheless argued that the recapper had, in fact, sold a product, which she identified as a recapped tire, including "the sale of labor," technical "know-how" and "a process that is beyond the consumer's ability to duplicate." *Id.* at 563. We rejected that argument, too, citing the Supreme Court's decision in *Hoover*, and concluded that the trial court had correctly refused to submit the claim to the jury. *Id.* at 563-64.

From the foregoing authorities, I derive a basic rule: Strict product liability will lie only for sale of a defective product; negligent installation of an otherwise nondefective product does not suffice. The key is the determination of whether the product itself, as opposed to its installation, is the source of the injury. Thus, in *Markle*, the plaintiff purchased a product, a tire, which was defective, and the court held that a claim for strict liability for defects in the tire could be sent to a jury. In contrast, in *Hoover* and in *Watts*, the defendants provided only services, installing and recapping tires respectively, and the courts held that strict liability could not be asserted.

In my view, the facts of this case are analogous to those in *Hoover* and *Watts*. The bakery owned a concrete

floor, which it wanted resurfaced with acrylic. Defendant applied the acrylic, which performed as specified by the manufacturer in all respects. The floor nevertheless proved too slippery for bakery use, but not because of any defect in the acrylic or other materials that defendant applied. Instead, the defect arose either from defendant's negligent selection of materials in the first place or from its negligent application of those materials onsite. In short, as in *Hoover* and *Watts*, we are confronted with injuries that arose out of negligent *installation* of a product but not a defect in the product itself. Such facts do not give rise to strict product liability.

The majority concludes otherwise, on the basis of *Jamison*, in which we said that an assembler of a trailer hitch may be held liable as if a manufacturer. The decision, however, offers support for the majority's position only if it is *assumed* at the outset that what the bakery in this case purchased was a product. In *Jamison*, the plaintiff purchased a product, an assembled trailer hitch, which the defendant improperly welded. What the plaintiff then received was a product, a trailer hitch, which was defective. The majority apparently assumes that what the bakery purchased also was a product: a new floor. I disagree. The bakery already had a floor, a concrete one, the same concrete one that it had used for many years. What the bakery purchased from defendant was the selection and application of a new surface on the existing floor. That constituted the provision of a service, as in *Watts*, where the defendant applied a new surface on an existing tire casing. Indeed, if the majority is correct, then *Watts* was probably incorrectly decided, for if the bakery purchased a "new floor" in this case, it stands to reason that the owner of the bald tire in *Watts* purchased a "newly-recapped tire" as well, an argument that we explicitly rejected in that case. *Watts*, 118 Or at 563.

That the resurfacing of the bakery's concrete floor cannot be considered a product is borne out by the consequences of the majority's view. For example, if the negligent resurfacing of a concrete floor in this case gives rise to strict liability, will the negligent refinishing of an oak floor—because, say, the refinisher selects the wrong finish, which otherwise performs as specified—give rise to such liability as

well? If not, why not? I can think of no principled distinction between applying a new finish to a concrete floor and a wood one. If the negligent refinishing of a wood floor as described does give rise to strict product liability, then does the negligent application of the wrong house paint to house siding? Again, if not, why not? I can think of no reason to support any difference in result. Yet I find it hard to believe that anyone would assert that negligent selection or application of the wrong house paint, which otherwise performs as manufactured, gives rise to strict product liability for any damage that results.

In short, I disagree with the majority's asserted analogy to *Jamison* as a basis for extending strict product liability to the negligent installation of a product. I read that decision to be distinguishable and find more persuasive an analogy to *Hoover* and to *Watts*. I would hold that the trial court erred in allowing plaintiff's strict product liability claim to go to the jury in this case and respectfully dissent from the majority's decision to the contrary on that issue.