Jack **ENSLEY**, as Personal Representative of the Estate of Benjamin M. Ensley, for the benefit of the statutory, Plaintiff,

v.

**STRATO–LIFT, INC.,** a.k.a. Strato–Lift & Boom, Inc., a foreign corporation, Strato Lift International Corporation, and Star Industries, Inc., d/b/a/ Star Rentals, a foreign corporation, Defendants.

No. CV–00–269–HU.

United States District Court, D. Oregon.

Oct. 6, 2000.

Jeffrey A. Bowersox, Bowersox Law Firm, Lake Oswego, OR, for Plaintiff.

Roger K. Stroup, Bodyfelt Mount Stroup & Chamberlain, Portland, OR, for Defendant Strato–Lift, Inc.

## OPINION & ORDER

HUBEL, United States Magistrate Judge.

Plaintiff Jack Ensley, as personal representative of the estate of Benjamin Ensley, brings this products liability and negligence action against defendants Strato–Lift, Inc., Strato Lift International Corporation, and Star Industries, Inc. The case concerns a February 1999 industrial accident involving a platform lift, which resulted in the death of Benjamin Ensley ("Ensley"), plaintiff's son. Defendant Strato–Lift, Inc.[1] moves for summary judgment on the basis that the lift's controls were modified between the time it was sold and Ensley's death.

## BACKGROUND

Plaintiff owns Drywall Constructors, Inc. (DCI), a drywall installation company.[2] Ensley worked for plaintiff, his father. On February 2, 1999, he was working on the company's platform lift, preparing it for an upcoming job. Ensley was working on or in the vicinity of the batteries, which are located in the lower compartment. He apparently raised the lift to gain access to the lower compartment and then leaned over the edge of the lower compartment with his chest near the lower control panel.

No one else was nearby. Plaintiff returned to the office and found Ensley trapped in the lift—the platform had lowered and plaintiff was trapped between the boom and the lower compartment. When plaintiff found Ensley, he was already

---

1. After Strato–Lift, Inc. filed the motion for summary judgment, I granted plaintiff's motion to file a second amended complaint adding defendants Strato Lift International Corporation and Star Industries, Inc. Since the newly added defendants have not joined in the motion, my reference will be to defendant in the singular, meaning Strato–Lift, Inc.

2. In his affidavit, plaintiff states that DCI was the name of his company at the time of the accident. The "synopsis" prepared by the Oregon Occupational Safety and Health Agency (Oregon OSHA) identifies the company as "AB Interiors, Inc." The discrepancy is not material.

dead. As noted in the medical examiner's report:

It would appear the subject had then raised the lift at least partway up and then extended his shoulders, head, and right hand into the center area where the batteries are stored to work on them. His neck was noted to be directly over an upright metal support. While he was in this position, the platform came down to the down position, pinning his neck tightly against the top of this metal support.

Deft's Exh. 3 at p. 1. And, as reported in the Oregon OSHA Synopsis:

The victim was in the process [of] getting an aerial lift ready for an upcoming job. He raised the aerial boom and positioned himself next to the on/off toggle switches that operate[ ] the lift controls. It appeared that he was reaching or stretching across to the opposite side where the battery compartment was located. As he was busy with his task, the lift descended unexpectedly and pinned him against the metal enclosure that houses the toggle switches used to raise or lower the lift.

Deft's Exh. 4 at p. 1.

The ground controls consist of a key and two toggle switches. Deft's Exh. 2 at p. 1; Deft's Exh. 5 at p. 1. To operate these controls as they are designed, one must first insert the starting key and turn the key to "on." When the key is on, the left toggle switch determines which of the control panels, either the ground controls or the platform controls, will actually control the lift. To activate the ground controls, this left toggle switch must be held down. If the switch is not held in the down position, it is spring loaded so it returns to neutral and power defaults to the platform controls. With the key on and the ground control left toggle switch held down, pushing the right toggle switch up raises the lift and pushing it down lowers the lift. If the operator lets go of the right toggle switch, it is spring loaded so it returns to neutral and the lift platform will then remain at the elevation where it was when the switch was released. Therefore, to lower the lift from the ground control station, the operator must have the key in, and in the "on" position, and then hold both toggles down simultaneously and continuously. If the key is not in the machine or, if it is not turned to "on," neither of the control panels can be used to raise or lower the lift. And, if the key is in and on, if either toggle on the ground control panel is released, the platform will not move up or down without operation of the platform controls.

Sometime after this lift was sold, someone clipped a metal ring to the wire that runs from the ground control on/off switch to the battery. This bypassed the need for a key. With the metal ring attached, it was as if the key was "on" at all times. Therefore, someone could raise or lower the lift with just the toggles, at any time, without a key. This metal ring was attached and there was no starting key in or near the machine when Ensley was found.

As can be seen from the exhibits, whomever wired the ring first had to locate the wires at the back of the key switch, cut the wires, attach two connectors to the severed wire, and then find and attach an electrically conductive clip ring to the two connectors so that the machine had power to the controls. Plaintiff admits that although he lacks definite knowledge of who applied the metal ring to the wires at the back of the switch, or when that occurred, he believes that Ensley applied the ring on the day of his death because the key was lost or because the switch was defective. Plaintiff admits that Ensley was aware that the metal ring had been applied to the wires on the back of the on/off switch.

Plaintiff alleges that the lift was defective and unreasonably dangerous because (1) there were no guards around the ground controls; (2) the ground controls were in a dangerous position; (3) there was no gravity-drop peg leg or jack stand that prevented the boom from descending without first being manually moved out of the way by the user; (4) there was no

physical barrier preventing a person from accidentally placing his body under the articulated boom; (5) there was no warning on the machine, in the operating and safety manual, or in the operation and maintenance manual, that the key switch was intended to be a safety feature; and (6) there was no warning on the machine, in the operating and safety manual, or in the operation and maintenance manual, instructing a user to block the lift while performing maintenance on the machine while the platform was raised.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.' " *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991) (quoting *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Id.; In re Agricultural Research and Tech. Group,* 916 F.2d 528, 534 (9th Cir. 1990); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987).

## DISCUSSION

Defendant raises two issues in its motion: (1) the modification issue; and (2) whether plaintiff can maintain a negligence claim against defendant independent of the product liability claim.

### I. Modification

The leading Oregon Supreme Court case, and the case primarily relied on by defendant, is *Seeborg v. General Motors Corporation,* 284 Or. 695, 588 P.2d 1100 (1978). In that case, the court held that "[b]efore a purchaser may recover upon a products liability cause of action he must demonstrate that at the time the product leaves the manufacturer's or seller's hands it is dangerously defective." *Id.* at 700, 588 P.2d at 1103; *see also* Or.Rev. Stat. (O.R.S.) 30.920(1) ("One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer...."). The court added however, that "before plaintiff is entitled to a jury determination, there must be evidence from which it could be found that no change in the condition of the [product] had been made from the time of its purchase which was essential to the cause of the loss." *Id.*

In *Seeborg,* shortly after the plaintiff had purchased a new car, it began to blow fuses. After the third time, a service station put in a "heavier" and "stronger" fuse, which appeared to solve the problem. However, a few months later, the car was destroyed by a fire of unknown origin while parked in the plaintiff's driveway.

The defendants moved for summary judgment because of the post-purchase alteration to the vehicle (the installation of a "heavier" and "stronger" fuse) and because the "plaintiff could not demonstrate that it was more probable than not that the change was immaterial to the vehicle's destruction." *Id.* at 701; 588 P.2d at 1103. The plaintiff argued that the defendants were not entitled to summary judgment because they had not carried "their burden to show that the installation of the (stronger) fuse was the proximate cause of the fire." *Id.*

The court concluded that the plaintiff misunderstood the burden which the defendants bore in establishing their right to summary judgment:

> Defendants do not have to establish that the stronger fuse was the cause of the fire; what they do have to establish is that because of the installation of the stronger fuse plaintiff cannot carry his burden to show that there was no change in the vehicle which was essential to its destruction by fire, and thus, that it was dangerously defective at the time of its purchase.... They have to show that the facts are insufficient to establish that the defective condition of the vehicle which caused its destruction was dangerous at the time it was sold.

*Id.* at 701; 588 P.2d at 1103. Finally, the court explained that

> The test is often expressed in this way: where from the facts most favorable to the plaintiff the nonexistence of the fact to be inferred (that there had been no change essential to the cause of the fire) is just as probable as its existence (or more probable than its existence), the conclusion that it exists is a matter of speculation, surmise, and conjecture,

and a jury will not be permitted to draw it.

*Id.* at 703; 588 P.2d at 1104 (internal quotation omitted).

The court noted that the plaintiff was correct that neither the court nor the parties knew whether the "stronger" fuse was of a higher amperage. But, the court indicated, that was the point: no one knew one way or the other. If it was a higher amperage, then it was likely an essential cause of the fire. Because it was simply speculation one way or the other, the plaintiff was not entitled to a jury determination. *Id.* at 702–03; 588 P.2d at 1104.

Defendant argues that under *Seeborg,* it is entitled to summary judgment because plaintiff cannot show that "hot wiring" the key switch did not contribute to the accident. Defendant articulates two scenarios in which the modification to the key switch either may have or did play an integral role in Ensley's death. First, if the switch had not been so modified, and the key was lost or not operating, the platform would not operate and Ensley could not have raised it. Thus, if it were never raised, it could not descend and the death could not have occurred.

Alternatively, and more likely according to defendant, if the key had been inserted and no modification to the switch made, Ensley would have used the key to turn the machine on to raise the platform and then would have turned the key off before beginning to work on the machine. With the key off, the toggle switches on the ground control panel would not have been energized and any leaning against them could not have moved the platform.

Given these possibilities, defendant argues that plaintiff cannot carry his burden of showing that Ensley's death would have occurred even if there had been a key to turn on or off.

Plaintiff maintains that defendant is not entitled to summary judgment because there are issues of fact remaining as to the elements of O.R.S. 30.915, which provides

a defense to a product liability civil action for certain alterations and modifications. Plaintiff's primary argument is that Ensley's death was caused by the alleged product defects and it is irrelevant whether the power was turned on temporarily by a key or turned on temporarily by a metal clip ring.

The parties agree that the metal clip ring caused the lift to operate as if a key was in and turned "on." One of plaintiff's experts states that the metal clip ring was as accessible to Ensley as a key. Affid. of Herbert A. Painter at ¶ 10. With the metal clip ring, the key switch was powered on only when the clip was attached. When it was not attached, it was as if the key was "off" or not inserted in the switch at all. Therefore, plaintiff argues, defendant's argument loses its force because the key wires were not soldered together or otherwise affixed in a fashion demonstrating an intent to alter the wiring of the manufacturer on a permanent basis.

Plaintiff's citation to O.R.S. 30.915 raises a determinative issue. The statute provides that

[i]t shall be a defense to a product liability civil action that an alteration or modification of a product occurred under the following circumstances:

(1) The alteration or modification was made without the consent of or was made not in accordance with the instructions or specifications of the manufacturer, distributor, seller or lessor;

(2) The alteration or modification was a substantial contributing factor to the personal injury, death or property damage; and

(3) If the alteration or modification was reasonably foreseeable, the manufacturer, distributor, seller or lessor gave adequate warning.

O.R.S. 30.915.

As articulated by the *Seeborg* court, plaintiff must show as part of his prima facie case, that the product was dangerously defective when it left the seller or manufacturer's hands. Plaintiff satisfies this burden through the affidavit of Tom Baird, one of plaintiff's experts. Affid. of Tom Baird at ¶¶ 11–19, 21–22.

■ Further, however, defendant argues that *Seeborg* requires that plaintiff show that it is more likely than not (as opposed to a question of fact), that the modification made to the product was not essential to the cause of Ensley's death. Under *Seeborg*, defendant claims this showing is also part of plaintiff's prima facie case. But, under such an interpretation, there would be no situation in which the O.R.S. 30.915 defense would come into play. If, for example, a plaintiff were unable to meet the burden required by *Seeborg*, then the plaintiff fails to establish a prima facie case and either loses at summary judgment or at trial with no need for a defendant to rely on the defense in O.R.S. 30.915. On the other hand, if a plaintiff meets the prima facie burden defendant claims is required by *Seeborg*, a defendant could never succeed in asserting the modification defense in O.R.S. 30.915, because if plaintiff has already successfully shown that it was more likely than not that the modification was not essential to the accident, then the defendant could not possibly show that the alteration or modification was a substantial contributing factor to the injury or accident.

Therefore, defendant's suggested interpretation of *Seeborg* results in the nullification of O.R.S. 30.915 which would be contrary to the legislature's intent in enacting the provision. Such an interpretation cannot survive. *See, e.g., Allen v. Jackson County,* 169 Or.App. 116, 7 P.3d 739, 758 (Or.Ct.App. 2000) ("It is axiomatic that statutes are to be interpreted to give meaning to each statute.") (Edmonds, J., concurring); *Plotkin v. Washington County,* 165 Or.App. 246, 254, 997 P.2d 226, 230 (2000) (it is a principle of statutory construction that legislative language should not be treated as superfluous and a nullity) (Deits, C.J., concurring and dissenting).

O.R.S. 30.915 was enacted in 1977, before the 1978 decision in *Seeborg*. *Seeborg* makes no mention of O.R.S. 30.915 pre-

sumably because when passed, O.R.S. 30.915 did not apply to causes of action or claims arising before its effective date of January 1, 1978. 1977 Or. Laws, c. 843, § 5 (O.R.S. 90.315 applies only to causes of action, claims, rights, or liabilities accruing after December 31, 1977). When the Oregon Supreme Court analyzed the issues in *Seeborg,* the modification of a product was part of the "common-law" of product liability because there was no controlling Oregon statute on the issue.

In 1967, the Oregon Supreme Court adopted the principles of Restatement (Second) of Torts, § 402A as the proper method of analyzing strict products liability claims. *Heaton v. Ford Motor Co.,* 248 Or. 467, 470, 435 P.2d 806, 808 (1967); *see also Gladhart v. Oregon Vineyard Supply Co.,* 164 Or.App. 438, 451 n. 6, 994 P.2d 134, 142 n. 6 (1999) (Restatement (Second) of Torts, § 402A is the source most cited in Oregon cases since *Heaton* ), *rev. allowed,* 330 Or. 363, 6 P.3D 1103 (2000); O.R.S. 30.920(3) (expressly providing that O.R.S. 30.920 (establishing seller or lessor liability) to be construed in accordance with Restatement (Second) of Torts, § 402A and Comments a to m).

Comment g to section 402A provides that the rule in section 402A applies "only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts, § 402A, comment g. It further states that the "burden of proof that the product was in a defective condition at the time that it left

the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained." *Id.*

Clearly, *Seeborg*'s holding that a plaintiff must show, as part of his or her prima facie case, that the product was dangerously defective when it left the seller's or manufacturer's hands, follows the law as outlined in comment g of section 402A. But, an interpretation of *Seeborg* that requires a plaintiff to establish as part of the plaintiff's prima facie case, that any post-delivery modification was not an essential cause of the injury or accident, may not be consistent with section 402A or comment g.[3]

However, even if *Seeborg* properly interpreted section 402A and comment g, the Oregon Legislature has seen fit to expressly place the burden on defendant. In contrast to *Seeborg,* O.R.S. 30.915 applies to the facts of this case and I must address its role in the analysis.

■ I conclude that the portion of *Seeborg* that defendant suggests requires plaintiff, as part of his or her prima facie case, to establish that it is more likely than not that any post-delivery modification was not essential to the injury or accident, cannot survive O.R.S. 30.915. Therefore, while plaintiff must still show that the product was defective at the time it left the manufacturer's or seller's hands, when this is done, the burden shifts to defendant to show, as an affirmative defense, that a post-delivery modification or alteration precludes liability under O.R.S. 30.915.[4]

---

**3.** It is interesting to note that the comments to Restatement (Third) of Torts, § 2, governing products liability (not adopted by the Oregon courts as of this writing), provide that

> misuse, modification, and alteration are not discrete legal issues. Rather, when relevant, they are aspects of the concepts of defect, causation, and plaintiff's fault. Jurisdictions differ on the question of who bears the burden of raising and introducing proof regarding conduct that constitutes misuse, modification, and alteration. The allocation of burdens in this regard is not

> addressed in this Restatement and is left to local law.
>
> Restatement (Third) of Torts, § 2, cmt. p.

**4.** This is so even for cases to which O.R.S. 30.920 applies. O.R.S. 30.920 became effective in 1979, two years after the passage of the first product liability statutes. It applies only to sellers or lessors of a product. While I have not researched whether its enactment was in any way a response to *Seeborg,* it expressly provides that the product must reach the user or consumer without substantial change in the condition in which it was sold or leased. O.R.S. 30.920(1)(b). Thus,

Under O.R.S. 30.915, defendant must show that there are no genuine issues of material fact as to each of the three elements of the defense: that the modification was made without defendant's consent or not in accordance with defendant's instructions, that the modification was a substantial contributing factor to Ensley's death, and that if the modification was reasonably foreseeable, defendant provided adequate warning. Even assuming that defendant can show an absence of fact issues on the first and third elements, plaintiff's evidence creates an issue of material fact as to whether the modification played a substantial contributing role in the accident. Defendant has offered nothing to suggest that it can prevail on the third element.

As to the causation element, plaintiff's expert states that Ensley's actions in overriding the key did not contribute to his death and the temporary override of the key system with the metal clip ring was not a causal factor in the accident. Baird Affid. at ¶ 21; *see also* Painter Affid. at ¶ 13 (metal clip ring did not alter or modify performance of lift in any manner that would have increased the risk of death to anyone). This evidence creates an issue of fact as to the modification's role in the cause of the accident.

Additionally, in contrast to the facts in *Seeborg,* here, the injury could have occurred even without the modification. In *Seeborg,* absent the heavier fuse, the fire would not have occurred either because the car was not defective when it left the manufacturer's or seller's hands, or because the original fuse would have blown rather than allow a fire to erupt. Here, while it is possible that had there been a key, Ensley may have turned it off and prevented the accident, the accident could still have occurred even if there had been no modification. If Ensley had a key,

turned it to the "on" position and left it there rather then turning it to "off," the ground control toggle switches could have been inadvertently activated just as they apparently were with the wire clip ring.

If the only way unguarded toggles (an alleged defect) or the lack of warning (an alleged defect) could cause the accident is to be combined with the modification, then defendant would likely be entitled to summary judgment. If however, the alleged defects themselves, without any modification, could cause the accident, then a question of fact exists with respect to causation. *See, e.g., White v. ABCO Engineering Corp.,* 221 F.3d 293, 303 (2d Cir.2000) ("material alteration alone is not a defense; rather, material alteration is only a defense when the alteration makes it impossible to conclude that a defect at the time of manufacture was a cause of the injury giving rise to the suit.").

Here, for the alleged defects to cause this accident, there must still be power to the ground controls. Power arrives there by one of two ways: (1) leaving the key in and ·in the "on" position, or (2) with the modification. Therefore, the alleged defects, without the clip modification, can cause the accident. The clips without the alleged defects, however, cause nothing.

In summary, plaintiff does not need to show that it is more likely than not that the hot wiring did not contribute to the accident. Rather, defendant must show that there are no genuine issues of fact as to whether the modification was a substantial contributing factor to Ensley's death, and that it in fact was. In this case, because the same injury could have occurred absent the clip "hot wiring" modification, in contrast to *Seeborg* where the fire would not have occurred without the heavier fuse, questions of fact exist regarding the role the modification played in the

the burden is on the plaintiff to prove, as part of the plaintiff's prima facie case, that the plaintiff received the product without substantial change. The statute is silent regarding post-receipt changes by the plaintiff or a third

party. But, such changes are covered by O.R.S. 30.915, an affirmative defense, and thus, a plaintiff need meet only the burden established in O.R.S. 30.920(1)(b) as part of the plaintiff's prima facie case.

accident. Thus, I deny defendant's motion for summary judgment on the strict products liability claim.

## II. Negligence Claim

■ Defendant argues that although plaintiff has alleged separate negligence and strict product liability theories, both claims are controlled by the substantive product liability law and statutes, and thus, plaintiff cannot maintain an independent negligence claim along with the strict product liability claim. Plaintiff argues that his negligence claim is separate and is not controlled by the product liability laws.

A "product liability civil action" is

a civil action brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury, death or property damage arising out of:

(1) Any design, inspection, testing, manufacturing or other defect in a product;

(2) Any failure to warn regarding a product; or

(3) Any failure to properly instruct in the use of a product.

O.R.S. 30.900.

Several cases have applied the statute of limitations or the statute of ultimate repose, from the products liability statutes to negligence claims falling within the parameters of O.R.S. 30.900. *See, e.g., Bancorp Leasing and Financial Corp. v. Agusta Aviation Corp.,* 813 F.2d 272, 277 (9th Cir.1987) (two-year statute of limitations of O.R.S. 30.905(2), not the four-year statute applicable to breach of warranty claims, governed the plaintiff's strict liability, negligence, and breach of warranty claims); *Philpott v. A.H. Robins Co.,* 710 F.2d 1422, 1424 (9th Cir.1983) (O.R.S.30.905(1), providing that a product liability civil action cannot be commenced later than eight years after the date on which the product was first purchased for use or consumption, applied to all of the plaintiff's claims, including negligence, breach of warranty, and willful misconduct); *Brokenshire v. Rivas and Rivas, Ltd.,* 142 Or.App. 555, 562 n. 3, 922 P.2d 696, 699 n. 3 (1996) (allegations amounted to a product liability civil action under O.R.S. 30.900 which embraced all theories in an action based on a product defect, including negligence); *Jamison v. Spencer R.V. Center, Inc.,* 98 Or.App. 529, 531–32, 779 P.2d 1091–93 (1989) (action for negligence against the seller of a product who had assembled the parts, was a product liability action under O.R.S. 30.900 and so, was governed by the eight-year product liability statute of ultimate repose and not a ten-year negligence statute of limitations); *Marinelli v. Ford Motor Co.,* 72 Or.App. 268, 273, 696 P.2d 1, 3 (1985) (O.R.S.30.905(1) barred the plaintiff's negligence claim because the term "product liability civil action" as defined in O.R.S. 30.900, "embraces all theories a plaintiff can adduce in an action based on a product defect.").

The common thread among these cases is the application of the statute of limitations or the statute of ultimate repose, to a negligence or breach of warranty claim alleging facts constituting a "product liability civil action" as defined in O.R.S. 30.900. In these cases, the plaintiff's strict product liability claim was barred by the applicable statute and the issue was whether the negligence or warranty claim was similarly barred.

Defendant has cited no cases, and I have found none, holding that a negligence action cannot co-exist with a viable strict product liability claim. Without any authority suggesting that a plaintiff cannot proceed on both theories, I decline to accept defendant's argument in the context of this case.

## CONCLUSION

Defendant's motion for summary judgment (# 10) is denied.

IT IS SO ORDERED.